## Court of Appeals.
### March 25, 1902.

## THE PEOPLE v. JOHN TRUCK.
(170 N. Y. Rep. 203.)

1. APPEAL.

> Where the record discloses that juror number one was not challenged by either party, and that the other eleven jurors were all duly accepted by the counsel for the defendant, it presents no point of law for the consideration of the Court of Appeals.

2. WITNESS—EXAMINATION OF PRISONER CLAIMING TO BE INSANE.

The practice of allowing the experts for the people and to the defense to make examinations of the prisoner in a room outside of the jail, is not improper as compelling him to be a witness against himself.

3. WITNESS—PRIVILEGED COMMUNICATION—HUSBAND AND WIFE—PENAL CODE, SECTION 715.

A wife is not incompetent, under section 715 of the Penal Code, from testifying that she secreted note paper and envelopes in clothing taken to him in prison, and that she afterwards stamped and mailed the letters, and it was afterwards shown that the letters were written and signed by the husband of a third person as a confession of having committed the crime, when it did not appear that the witness was informed of the contents of the letters or that she was aware of the names of the persons to whom they were addressed.

4. WITNESS—CONVERSATION TO SHOW MENTAL CONDITION AT TIME OF TRIAL.

Testimony of a witness for the people in rebuttal, as to the defense of insanity, as to a conversation with defendant, in which the latter charged the commission of another crime upon a third person, is not improper and incompetent as being an attempt to prove a crime not alleged in the indictment, where the examination was only intended to show the defendant's mental condition at the time of such conversation, and there was nothing in the meeting between the parties to reflect upon the defendant in connection with the former crime.

5. HANDWRITING EXPERTS.

Where several signatures of the defendant attached to papers executed in the transaction of ordinary business, not relating to the case, are proved by the person or persons who saw the signatures written by the defendant, and their genuineness is not attacked, they may properly be used by experts in comparison to determine whether alleged letters of a third party, confessing to the commission of a murder, are in the handwriting of defendant.

6. SUBMISSION OF FACTS TO JURY.

Where the trial judge stated to the jury that he could not undertake to comment upon the facts, but leave them for their consideration, and no request was made for the submission of any particular question of fact to the jury, an exception that the trial judge erred in not submitting all the questions of fact to the jury will not be considered on appeal.

7. HYPOTHETICAL QUESTION.

An objection to the form of hypothetical question, that it embodies facts not proven, is properly overruled where all the facts objected to by defendant's counsel have been stricken out.

8. FORMER TESTIMONY.

Incompetent evidence before a coroner of one accused of murder cannot be introduced generally on his cross-examination at the trial. If it be offered for the specific purpose of impeachment or contradiction it should be so limited.

9. MEDICAL EXPERT.

A medical expert cannot state what he discovered in a conversation had with defendant accused of murder, as to his insanity. He must disclose the facts on which he bases his opinion.

10. SAME.

A medical expert was asked, " I now ask you whether, assuming all the facts discovered by you on your different examinations of the defendant, and to which you have testified, and assuming those facts, was he, in your opinion, on the 14th of March, 1899, at the time of the alleged crime, sane or insane," held a proper question.

11. CHARGE TO JURY.

Where the judge charged the jury, " It is for you to say whether you are satisfied from the evidence beyond a reasonable doubt that the defendant killed the deceased.    If you do so find it will not be necessary to consider the other defense upon which the defendant relies," it is not prejudicial to the defendant where he further said, " If you find that the defendant killed W. you will then determine if the defendant was at that time responsible for his acts," which made it clear that the judge did not refer to the defense of insanity as the " other defense."

APPEAL from a judgment of the Supreme Court, rendered at a Trial Term for the county of Cortland, March 17, 1900, upon a verdict convicting the defendant of the crime of murder in the first degree.

Also appeal from an order made at a Trial Term, January 13, 1902, denying defendant's motion for a new trial on the ground of newly-discovered evidence.

The facts, so far as material, are stated in the opinion.

John H. McCrahon, for appellant.

Thomas H. Dowd, District Attorney (Horace L. Bronson of counsel), for respondent.

BARTLETT, J.: The defendant was indicted in the county of Cortland for the crime of murder in the first degree in having caused the death of Frank W. Miller on the 14th day of March, 1899, by inflicting injuries causing his death. The deceased was a bachelor, living alone on his farm in the town of Virgil, Cortland county, and was last seen alive by his mother about six o'clock p. m. on the day of the murder; she resided about half a mile from the house of her son. The son, returning home, paid his mother a visit, taking supper with her. She testified that he left her house not later than six o'clock and it might have been half-past five; that he gave as a reason for hurrying his departure that he had to do his " chores."

About half-past ten that evening, a witness, driving along the highway, about half a mile from the house of the deceased, met a man driving a gray horse hitched to a wagon with yellow running gear, in the direction away from the house; witness recognized the outfit as the property of deceased, but did not identify the man. The witness was well acquainted with deceased, resided in the neighborhood and was familiar with his horses, wagons and stable property.

A half hour later, about eleven o'clock, another witness with his wife, driving along the highway approaching the house of deceased, discovered it to be on fire. He came as near the burning structure as possible, and sought by calling aloud to arouse the deceased. Failing in this, he drove to the house of a neighbor and secured assistance. In the meantime the fire had been observed by neighbors in various directions, and a number of them assembled in the yard, but the house was wrapped in flames and nothing could be done to arrest their progress.

About this time the sides of the house, which was a wooden structure, were burned away so that the spectators could look into the bedroom usually occupied by the deceased. On the floor was a dark object, resembling in shape a human body, which seemed to be wrapped in a cloth or blanket. The bed-

room floor finally gave way and this object fell into the cellar. After the fire subsided, this muffled form was removed from the ruins, and upon a careful examination thereof by the coroner and physicians proved to be the partially consumed body of the deceased.

While the fire was in progress several of the neighbors entered the barn of the deceased and ascertained that the gray horse, wagon with yellow running gear, harness and other articles of personal property were missing. It was also discovered at that time that the cows had not been milked in the early evening, as usual, nor had the stock been bedded and fed. In other words, the deceased had not done his " chores " that night.

The autopsy disclosed that death was caused, not by fire, but by a blow on the back part of the head, fracturing the skull. A large amount of medical testimony bearing upon this fact was given by the People.

It would not be profitable to recount the grewsome facts in detail, upon which the physicians based their professional judgment, that the deceased was slain some hours before the breaking out of the fire and at a time when the digestion of the last supper, eaten by the victim at his mother's board, was arrested in its early stages.

The defendant John Truck formerly lived in the neighborhood where this crime was committed, but several years before had taken up his residence in Homer, Cortland county, which is about ten miles from the house of deceased. He was seen on the 13th of March, 1899, near the house of deceased by a number of people, and, also, on the 14th of March, the day of the murder. He called upon deceased on the evening of the 13th and was with him until nearly midnight, and he was seen on the premises a very short time before deceased must have arrived home after leaving the house of his mother. The fact of the defendant having been seen so frequently in this neighborhood during the forty-eight hours prior to the murder, and the additional circumstance of

the gray horse attached to the wagon of the deceased having been seen driving away from the premises within half an hour before the fire was discovered, led to fastening suspicion upon the defendant. Thereupon, the officers of the law immediately began investigations, and were soon able to follow the defendant in a northerly direction into Onondaga county, and on the 16th of March, near Tully in that county, he was apprehended, having in his possession the horse, wagon, harness, whip, clothing, watch, watch chain, a jar of butter, and various other articles of personal property taken from the premises of the deceased.

At the trial the defendant was not sworn, and there was no attempt on the part of the defense to meet this array of facts. The defense was insanity.

The trial of this case lasted some nineteen days, and after the People had proved, with great detail, the facts already briefly narrated, the defendant assumed the affirmative and sought to establish the allegation that the defendant was insane. In the first place a large number of witnesses were sworn, including a sister and several other relatives of the defendant; also a number of farmers for whom he had worked at different times during the last ten or fifteen years before the trial, showing him to be a man of varying moods and great eccentricity. This class of evidence, which was very lengthy, disclosed that the defendant had received two injuries upon his head in boyhood, and that his conduct throughout life had been such as to occasion remark, and led all these witnesses to answer the general question as to how his actions impressed them as being rational or irrational, that they deemed them irrational.

The defense also swore two distinguished experts, Dr. William A. White and Dr. Henry T. Dana, who, after personal examinations of the defendant, and in answer to two hypothetical questions, one of which embraced the history of the defendant as to his moods, eccentricities and general conduct,

and the other set forth the facts proved by the People to have occurred within forty-eight hours, more or less, of the murder, gave it as their opinion that he was insane and did not know the nature or quality of the act he committed, or that the act was wrong at the time he killed deceased.

The People, in answer to the defendant's proof on the question of insanity, swore a large number of witnesses who were familiar with the defendant in one way or another, covering a period of ten or fifteen years prior to the homicide, all of whom testified in substance that while he was to some extent peculiar, eccentric and moody, they did not deem his actions generally as irrational.

The People also placed upon the witness stand two distinguished experts upon insanity, Dr. Henry E. Allison, who had been connected with the Willard State Hospital or Asylum for the Insane, and afterwards was medical superintendent at the State Asylum for Insane Criminals at Auburn, and later was with the institution called the Matteawan State Hospital, to which were removed all of the insane criminals from Auburn.

Also, Dr. Allen MacLean Hamilton, who resides in New York city, is a specialist in the diseases of the mind and the nervous system, with an experience of twenty-five years as visiting physician to the insane pavilion at Blackwell's Island, has been the official or consulting physician at the Hudson River State Hospital at Poughkeepsie, and of the insane asylums at New York city, the State Asylum and the Manhattan Asylum or State Hospital, to which he was then attached.

These experts, after examinations of the defendant, and basing their answers on the facts that they had ascertained personally, and in reply to several hypothetical questions, gave it as their opinion that the defendant was sane on the 14th day of March, 1899, at the time of the commission of the alleged criminal act, and that he was not laboring under such a defect of reason as not to know the nature or quality of the act, or that it was wrong.

It remains to consider whether any of the exceptions taken by the defendant present legal error calling for a reversal. The first exception relates to alleged error in the acceptance of certain jurors. The record discloses that juror No. 1 was not challenged by either party, and that the other eleven jurors were all duly accepted by the counsel for the defendant. There is, therefore, no point of law presented to this court for its consideration.

The second exception is to the effect that the taking of the defendant by the sheriff to a room outside of the jail, and the examination of him by the experts employed by the People, was improper as compelling him to be a witness against himself. This practice of allowing the experts for the People and the defense to make examinations of the prisoner, as to his mental condition, is the ordinary procedure in cases where the defense of insanity is interposed, and was resorted to in this case by the defendant's counsel.

In the case of People v. Nino, 149 N. Y. 317, it was held that the jury were entitled to the facts on which an insanity expert bases his opinion as to the defendant's mental condition, and when those facts are the result of his own interviews with the defendant, it is not only competent but necessary that they should be laid before them in a case where it is asserted, as in the case at bar, that a defendant had been continuously insane from a period prior to the killing and up to the time of the trial.

The third exception relates to the evidence of one Laura Chapman, it being insisted that it required her to testify to a confidential communication between herself and her husband, the defendant, and was incompetent under section 715 of the Penal Code, which provides that neither the husband nor wife can be compelled to disclose confidential communications made by one to the other during their marriage.

This witness claimed to be the wife of the defendant, and admitted upon the stand that in taking clothing to him in the

jail, prior to the trial, she secreted therein note paper and envelopes. She testified that on the occasion of one of her visits the defendant handed her two letters sealed; that she took them with her on leaving the jail and deposited them in the post office after attaching stamps to the same. This evidence was objected to, and exception duly taken, on the ground that it was within the statutory provision as to a confidential communication made by the husband to the wife. It does not appear in the testimony of the alleged wife, or in any other manner, that she observed to whom these letters were addressed, or that she had any knowledge of their contents. The materiality of this objection is apparent as it was proved that during the time the defendant was confined in the jail, prior to the trial, he wrote two letters, one to a man named Witty and the other to one Fassett, signing thereto the name of one Beebe, these letters each containing the alleged confession of Beebe that he committed the murder and the defendant was innocent.

Experts in handwriting were placed on the stand by the People, who having before them genuine standards of defendant's handwriting, testified that these letters were written by him. As these letters were strong incriminating evidence, it was of great importance to the defendant if he could prevent the proof of having sent letters through the mail while he was confined in the jail awaiting trial.

The People, in order to meet the objection that the receiving and mailing of these letters involved a confidential communication, suspended the examination of Laura Chapman and placed on the stand a woman named Mary Truck, who testified that she married the defendant seventeen years before and was still his wife. The cross-examination brought out the fact that she could not give the name of the clergyman who performed the marriage ceremony, or scarcely any of the details relating to so important an event in her life; she was also compelled to admit that she had contracted an alleged marriage within two years of her examination. After introducing this proof Laura

Chapman was again placed upon the stand by the People and asked about receiving and mailing two letters. The objection was still insisted upon, but the learned trial judge, while characterizing this proof of a prior marriage as "very shadowy to say the least," admitted the evidence.

It may be that the testimony of this alleged first wife, standing uncontradicted by the defendant, was sufficient to show that the Chapman woman, who claims to have been married to the defendant long after the alleged first marriage, was not his legal wife; we do not wish to be understood as holding otherwise. We are of opinion, however, that the receiving of these letters from the defendant by Laura Chapman, and the mailing of them at his request, was not a confidential communication between husband and wife, as it does not appear that Laura Chapman was informed of the contents of the letters, or that she was aware of the names of the persons to whom they were addressed. The bald fact that she deposited two letters in the post office, at her husband's request, does not, unsupported by other proof, constitute a confidential communication.

The fourth exception of the defendant is, in substance, that the evidence of one Richard Sevenoaks was improper and incompetent, for the reason that it was an attempt on the part of the prosecution to prove a crime not alleged in the indictment and forming no part of the transaction out of which this case arose.

An examination of the record shows. that there was no effort on the part of the prosecution to prove that the defendant was improperly connected with what was known as the "Preble wreck" in 1896, on the Delaware, Lackawanna & Western railroad. The witness was examined by the People, in rebuttal, as to the defense of insanity, and the sole effort, as disclosed by the record, was to show his mental condition at the time of the conversation. At this interview the defendant charged the commission of the crime of derailing a train on a third party,

and there was nothing in the meeting between Sevenoaks and defendant that reflected upon the latter in connection with the " Preble wreck."

The defendant insists, under his fifth exception, that the handwriting experts were incompetent to make comparisons of the specimens of handwriting, as there were no standards to which reference could be made for the purpose. The fact is that there were several signatures of the defendant attached to papers executed in the transaction of ordinary business not relating to this case, which were proved by the person or persons who saw the signatures written by the defendant. The genuineness of these standards was not attacked, and they were properly used by the experts in determining the question whether the alleged letters of Beebe, confessing to the commission of the murder, were in the handwriting of the defendant. (People v. Molineux, 168 N. Y. 264.)

The sixth exception raises the point that the trial judge committed an error in not submitting all the questions of fact to the jury. The trial judge, after an able charge as to the law of the case, stated to the jury that he would not undertake to comment upon the facts, but leave them for their consideration. No request was made by the defense that he submit any particular question of fact to the jury. Several requests were made by defendant's counsel as to charging propositions of law which were substantially adopted by the court.

The next exception relates to the ruling of the trial judge, upon objection made to the form of the hypothetical question framed by the counsel for the People, as embodying facts not proven.

The court required the defendant's counsel to indicate such alleged facts, and this being done, the question was amended by striking them out. The defendant's counsel in this connection said: " One important fact is that the question only assumes a bare statement of a very few of the facts in the case." The court replied: " I do not understand that the rule

requires them to state all the evidence in the case. I do not recollect any facts stated in the question upon which there has not been proof given. If you think of any we will strike it out." The defendant's counsel then said: "I think the important ones have been called attention to." The court then overruled the objection and the question was answered. This ruling was clearly correct.

There are a few other exceptions to which the defense called attention. William Bloomer was a witness for the People and under cross-examination this question was asked him: "You testified before the coroner that he appeared absent-minded, didn't you?" The People objected to this as incompetent and improper and calling for the conclusion of the witness. The court said: "The question is what he swore to on the former occasion." The People's counsel replied: "It was incompetent evidence if given there, and they cannot get it in here if it is incompetent. He is not competent to give or to express an opinion, and they cannot ask him his opinion here, and cannot prove that he swore somewhere else, that involves any opinion." The court thereupon sustained the objection and the defense excepted. A witness may state whether the actions of a person impressed him as rational or irrational, but can go no further. Incompetent evidence before a coroner cannot be introduced generally at the trial. If it be offered for the specific purpose of impeachment or contradiction it should be so limited. ' The ruling presents no error.

Dr. White, one of the experts for the defendant, was asked this question: "State what you discovered in the conversation you had with the defendant?" This was objected to on the ground that the witness had not disclosed the fact upon which he was called upon to base his opinion. This objection was properly sustained; the witness should have disclosed the facts on which he based his opinion.

Dr. Hamilton, one of the experts for the People, was asked this question: "I now ask you whether, assuming all the facts discovered by you on your different examinations of the defendant, *and to which you have testified,* and assuming those facts, was he, in your opinion, on the 14th of March, 1899, at the time of the commission of the alleged crime, sane or insane?" The doctor answered, "I believe him to have been sane." Thereupon, the defendant's counsel said: "I make the same objection to the question as when put to the other witness. The Court: Same ruling. Exception taken by defendant." This objection was made after the answer was given, but as the court ruled upon it, it may be regarded as properly before us. We are of opinion that as this general question limited the expert to assuming only these facts to which he had testified, it was, therefore, proper.

There are several other exceptions which we have examined, but find in them no reversible error.

Our attention has been called to a few sentences in the charge of the trial judge to the jury which are said to lack clearness and may have prejudiced the defendant. The brief points out no exception raising this point, nor have we been able to find it in the record, but, nevertheless, we will treat the question as before us. The following is the portion of the charge criticised: "It is insisted on the part of the People that the evidence shows that the defendant went to the house of the deceased and killed him in pursuance of a resolution wholly and completely formed several days before he committed the act; that Miller was killed by violence and that that appeared from the condition of the body and by the break in the skull; and by the fact that the defendant had in his possession numerous articles of personal property belonging to the deceased, immediately after the crime was committed; and it is also claimed that it appears from the letters that were introduced in evidence and from other facts that have been fully discussed by the counsel for the people.

"It is for you to say whether you are satisfied from the evidence beyond a reasonable doubt that the defendant killed the deceased. If you do so find it will not be necessary to consider the other defense upon which the defendant relies."

The counsel for the defendant ends his quotation from the charge at this point. The next sentence should have been quoted in order to ascertain the precise meaning of the trial judge. It reads as follows: "If you find that the defendant killed Frank W. Miller, you will then determine if the defendant was at that time responsible for his acts."

This last sentence makes it perfectly clear that the trial judge did not refer to the defense of insanity when he told the jury that in a certain contingency it would "not be necessary to consider the other defense upon which the defendant relies." While this portion of the charge lacks clearness, it is quite obvious that the "other defense" referred to was the alleged failure of the People to establish deliberation and premeditation.

The trial judge, while not referring to another felony by name, rehearsed facts to the jury showing that the motive of the crime was burglary. If the jury found these facts the questions of deliberation and premeditation were out of the case.

This portion of the charge, read as a whole, did not prejudice the defendant. The jury were fully authorized by the facts in finding that the defendant killed the deceased while engaged in the commission of another felony. They were also given to distinctly understand that the defense of insanity was to be duly considered.

It remains to examine the appeal from the order denying the motion made by defendant for a new trial. The notice of motion contains twelve distinct grounds upon which the new trial was asked, including the general ground that justice requires the motion should be granted. The discussion of the appeal from the judgment, in this opinion, is a sufficient answer

to the motion for a new trial, as the latter raises no additional points.

In the course of a lengthy trial many witnesses were sworn, and the case of the People was impressively supplemented by the silent testimony of unchanging physical laws and a .network of circumstantial evidence, bringing out with startling distinctness a terrible triple crime, involving murder, arson and burglary, witnessed by no human eye. Assuming, as we must, that this defendant was sane when he committed this deed, justice requires that she should suffer the extreme penalty of the law.

The judgment and order appealed from should be affirmed.

PARKER, Ch. J., GRAY, O'BRIEN, HAIGHT, CULLEN and WERNER, JJ., concur.

Judgment and order affirmed.