Interlocutory judgment reversed, and demurrer overruled, with leave to the defendant to plead anew.

All concur, except WARD, J., not voting.

---

## Court of Appeals. Supreme Court.

### June 6, 1899.

### PEOPLE v. LEWIS PULLERSON

1. CRIMINAL LAW—CONFESSION.

   The confession is voluntary, where it is not made under the influence of fear produced by threats or upon any stipulation of the district attorney.

2. SAME.

   The confession of the accused, though not sufficient to warrant his conviction without additional proof that the crime charged has been committed, is sufficient for this purpose where there is ample evidence aside from the confession, corroborating the statements of the defendant.

3. SAME.

   The circumstantial evidence in this case furnishes proof of the commission of the crime in addition to the confession, and warrants the inference of deliberation and premeditation.

APPEAL from a judgment of the supreme court upon a verdict convicting the defendant of the crime of murder in the first degree.

Edmund B. Brown, for appellant.

Charles E. Le Barbier, Assistant District Attorney, for the People.

HAIGHT, J.—The facts in this case are without material dispute. They are substantially as follows: The defendant, Pullerson, a colored man, and Kate Smith, a white woman, occupied a room on the second floor of a house kept by Mrs. Catherine Lee, known as "No. 327 West Thirty-Ninth street in the city of New York. They lived together as man and wife, but were not married. Pullerson had been out of work for several months, but Kate had a situation as waitress in a restaurant kept by one Bowyer. On the morning of the 10th day of March, 1898, Kate told Pullerson that she was going to the theatre that evening. He appears to have had some suspicion that she was deceiving him, and he, therefore, in the evening, went down in the neighborhood of the restaurant where she was working, and waited upon the opposite side of the street until she came out. She then went to a house No. 420 West Twentieth street, he following her, at which place she met a white man waiting for her in the vestibule of the house. As they met, they embraced; then went inside. Pullerson secreted himself behind a post on the opposite side of the street, and there watched the house for about an hour and a half, until Kate came out. It was then about twenty minutes after seven o'clock. She went along Twentieth street to Ninth avenue, and then jumped on to a car going towards her home. Pullerson had no money with which to pay the car fare, and he accordingly walked, reaching home about five minutes after her arrival. At that time Kate was sitting in the kitchen of Mrs. Lee, waiting for Pullerson to come in with the key to their room. When he arrived, he looked into the kitchen, and said to her, in the presence of Mrs. Lee and a Mrs. Stevens, that he thought she was going to the theatre that evening. She made

some reply, the exact purport of which was not understood by those women, and then arose from her seat, and followed Pullerson into their room. About fifteen or twenty minutes after, Pullerson came to the kitchen door, put his head inside, and said he wished to speak to Mrs. Lee at the front door. She replied, "What do you want to make me go downstairs for?" He said, "I want to speak to you." So she went down, and he placed the key of the room in her hand, and said : "I am sorry I am giving you this key in this way. You have always treated me as a lady since I have been with you, and I appreciate you as such, but I am giving you this key because I am giving my room up. I have killed Kate, and I am going to the station house now to give myself up." With that he went out of the front door, and disappeared. Mrs. Lee immediately returned to her kitchen, told Mrs. Stevens what had occurred, and she ran for an officer. Officer Monroe was found in a few minutes, and returned with Mrs. Stevens to the room. The officer took a lamp and the key, and went with Mrs. Stevens into the Pullerson room, the door of which was found locked. Kate was found lying upon the bed, dead. The body was dressed in a black skirt, with a purple waist, and a lavender ribbon around the neck. The clothing of the body appeared to have been spread out, and was evenly arranged. The pocket in the dress, however, was wrong side out, and upon the floor underneath was found a penny. There was blood that trickled down from the eardrum, and there was froth coming from the nose. Her face was congested and blue, and there were marks upon her neck. Dr. Williams, one of the coroner's physicians, made an autopsy upon the body, and found that the rings of the trachea, below the larynx, were lacerated, and that death was caused by congestion and œdema of the lungs, which were produced by force applied to the throat, and that the force in this case, in the opinion of the doctor, was choking.

After Pullerson had delivered the key to Mrs. Lee, and left the house, he appears to have procured a postal card, and written to Mrs. Bowyer, in which he referred to No. 4, calling her a whore, and stated that she would not come "to your place any more." Kate was known in Mrs. Bowyer's restaurant as wai-

tress No. 4. He then, according to his own story, went to a saloon in Seventh avenue and Thirty-Eighth street, and got a drink. He then took a Broadway car, and went down town, and walked part way across the Brooklyn Bridge. He then walked back, and went to a saloon in West Third street, where he was found by the detectives, about five o'clock in the morning, drinking a glass of beer. After his arrest he talked freely with the officers in reference to the transaction, and after he arrived at the station house his statement was written down, read over, and subscribed by him. All of the facts with reference to his following the deceased from the restaurant where she was working to 420 West Twentieth street, and her meeting and remaining with a man there for upwards of an hour, are taken from his statement. After their return to the kitchen of Mrs. Lee, his statement is in accord with hers, with the exception that he stated that he guessed that he had killed Kate, instead of saying that he had killed her. His statement is to the effect that, after returning to their home, he said to her. " ' I thought you were going to the theatre ? ' She said : ' Well, I intended to go to the theatre, but I had so many people to wait on it kept me until after seven o'clock, and I could not go.' This conversation took place in our room. I says to her : ' Why don't you tell the truth ? Did you come direct home from you work ? ' She said : ' Yes, I took the Sixth avenue car, and came directly home.' I said to her : ' You are a stinking liar. You went all the way to Ninth avenue, and down to Twentieth street, and into a house, and a man met you at the door. Is that what you are doing, going around meeting men ? She says : ' It is none of you damn business.' I says : ' Stop this swearing in here. It is bad enough for you to do wrong. Leave me do the swearing.' She says : ' I will go where I please, and meet whom I please." I said : You ought to be ashamed of yourself going around and meeting men on the outside. It is bad enough for us to live together.' One word brought on another. She struck at me, and I choked her. I did not know that I had killed her. I just put my hand around her neck, and choked her. I then put a clean handkerchief in my pocket, and left the house. I went in the next room to Mrs. Lee, and

said: 'I guess I have killed her. I don't know.' " It is true, the confession of the accused is not sufficient to warrant his conviction without additional proof that the crime charged has been committed (Code Cr. Proc. § 395) ; but in this case we have ample evidence, aside from the confession, corroborating the statements of the defendant. We have a woman in apparently perfect health entering a room with the defendant with closed door; who, within fifteen or twenty minutes thereafter comes out of the room, locks the door, and goes away, and within nine or ten minutes thereafter the the woman is found in the room, upon the bed, dead. Her face was blue and congested, blood trickled from the drums of her ears, froth came from her nose, marks were upon her face and neck, and the autopsy shows that death was produced by force applied to the neck, rupturing the trachea, and shutting the air out from the lungs. The only question that can arise out of these facts as to which there can be a possible doubt is as to whether there was that deliberation and premeditation on the part of the defendant which would constitute the crime of murder in the first degree. Upon this subject the trial court very fully and properly instructed the jury with reference to the rule of law that should control them in determining this question. The medical expert who made the autopsy tells us that the choking would have to continue for the space of about three minutes in order to produce death. He consequently had that time to consider the nature of his act. Evidence to which we have already alluded tends to show that he was very jealous of the deceased, and highly incensed at her conduct in meeting another man. He had followed her for a considerable distance after discovering her misconduct, and had ample time to determine the character of the punishment he should inflict. The postal card written by him to Mrs. Bowyer, after he had produced her death, tends to show that his vengeance was great, and had not abated at that time, for he then applied to her the vilest epithet. At the same time, it is apparent he had not hesitated to appropriate her money. A few minutes before, he had not sufficient money, to pay a street car fare. When her body was found, the pocket of her dress was found turned inside out. After that he had money

with which to buy drinks at saloons, and to ride down town upon a Broadway car. Under all of the circumstances, we think the question of deliberation and premeditation was properly submitted to the jury, and that the evidence is sufficient to sustain the verdict rendered.

Upon the argument of this appeal it was contended by the counsel for the appellant that the postal card was improperly received in evidence; that the proof of the defendant's handwriting was not sufficient. However this may be, there can be no doubt about the competency of the postal card as evidence, for the defendant himself admits that he wrote it. The confession was voluntary. It was not made under the influence of fear produced by threats, or upon any stipulation of the district attorney.

A claim is made that there were errors occurring in the charge of the court to the jury. No exception whatever was taken to the charge. We have carefully examined it, and find nothing therein that we regard as prejudicial to the rights of the accused. The judgment should be affirmed. All concur, except GRAY, J., absent.

Judgment affirmed.