## Court of Appeals.

May 2, 1905.

## THE PEOPLE v. EMIL TOTTERMAN.

(181 N. Y. 385.)

MURDER—SUFFICIENCY OF EVIDENCE OF PREMEDITATION AND DELIBERATION.
The evidence upon the trial of an indictment for murder reviewed and held sufficient to establish the premeditation and deliberation required under the statute to constitute murder in the first degree.

APPEAL from a judgment of the Supreme Court, rendered March 2, 1904, at a Trial Term for the county of New York upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

Frederick E. Goldsmith and Henry J. Goldsmith for appellant. The prosecution have failed to show premeditation and deliberation. (Penal Code, § 183; People v. Majone, 91 N. Y. 211; People v. Boggiano, 179 id. 267; Leighton v. People, 88 id. 117; People v. Conroy, 97 id. 62; People v. Hawkins, 109 id. 408; People v. Johnson, 139 id. 358; People v. Constantino, 153 id. 24; People v. Kennedy, 159 id. 346; People v. Koenig, 180 id. 155; People v. Leighton, 1 N. Y. Cr. Rep. 471.)

William Travers Jerome, District Attorney (Howard S. Gans of counsel) for respondent. There was sufficient evidence upon the issue of premeditation and deliberation to require the submission of this issue to the jury and to justify their verdict. (People v. Conroy, 97 N. Y. 62; People v. Schmidt, 168 id. 568; People v. Ferraro, 161 id. 375; People v. Beckwith, 103 id. 360.)

CULLEN, Ch. J.: While the guilt of the appellant was established by circumstantial evidence, that evidence is exceptionally strong and leaves no room for doubt. The murdered woman was a strumpet. Shortly after ten o'clock on the evening of December 19th, 1903, she entered the barroom of a hotel of low character in James slip, in the city of New York. In a few minutes a man carrying a bundle came into the barroom. He got into conversation with the deceased, sat down at the table with her, where they drank together. After a short time the man and the deceased were shown by a woman servant to a room upstairs, into which they retired. This servant had some conversation with the man. Twice the deceased and the man sent down to the barroom for something to drink. On the first occasion the order was taken by the servant already mentioned, and the drinks taken by her to a room which the deceased and man were occupying. On the second occasion the same thing was done by another woman servant of the hotel. After this the door of the room was bolted on the inside. The proprietor of the saloon or hotel, one James Kelly, with his barkeeper, remained up during the night to see if any other customers might seek to come in. No one, however, came. About eight o'clock in the morning Kelly went to bed. Shortly afterwards one of the women servants above referred to found the door of the room unlocked, entered and saw the deceased lying on the bed, as the witness thought, asleep; the man had disappeared. In the afternoon the woman servant again entered the room, found the deceased in the same position as before, but on making examination at once discovered that she was dead. The police were called in and the body removed to the morgue, where subsequently an autopsy was had. It appeared that the deceased had come to her death by strangulation and by a stab wound through the heart. In addition to that through the heart other wounds had been inflicted by a sharp instrument; one in the abdomen, one across her breast, besides several in other parts

of her body unnecessary to detail. There were found in the room, saturated with blood, a shirt and an undershirt of the man, also a box in wrapping paper.

The evidence to connect the defendant, who was arrested on Monday, with the crime, briefly, is as follows: First, he was positively identified by Kelly and the two women as the man who had accompanied the deceased to the room on the night of the crime. The box referred to as found in the room was a shoe box bearing the label of Meigs & Company, Bridgeport, Conn., and on it was written the names " Fred B. Belano " and " Emil Totterman." In the box were two sales slips of the Bridgeport firm and a pair of old shoes. It was proved that on the morning of the homicide the defendant, who was a sailor, had been discharged at Bridgeport, Connecticut, from the schooner " Fred B. Belano." Two salesmen from Meigs & Company positively identified the defendant as a man to whom they sold goods on that morning. The first sold him a sweater for three dollars and he identified the sales ticket found in the box as being in his handwriting and representing that sale. The defendant put the sweater on and as he wanted to purchase also a pair of shoes he was taken to the second salesman to whom the ticket for the sweater was given. This last salesman testified that the defendant tried on several pairs of shoes till finally one was found satisfactory. This the defendant bought and put on, giving his old shoes to the salesman to be wrapped up. The old shoes were placed in the shoe box with the ticket made by the first salesman for the sweater, as well as the second one made by this witness for the shoes. The witness positively identified the shoes found in the room where the deceased was murdered as being the same ones that the defendant had worn when he purchased the new pair. The sweater which the deceased was wearing at the time of his arrest was testified by the first salesman to be the one he had sold on the morning of the murder. It was also proved by a member of the crew of the

Belano that after their discharge from the vessel the defendant went into Meigs' store, the witness remaining on the sidewalk; that the defendant came out of the store with a box or bundle; that shortly afterwards they took a train to New York city, arriving there about 8 P. M., and at the station took the elevated railroad to go downtown. The witness got off at Fourteenth street, leaving the defendant in the train. A police officer testified that about two o'clock in the morning of December 20th he found the defendant trying to obtain admission into a place on South street. The defendant said that he wished to go some place to spend the night and the officer referred him to a lodging house in the vicinity. The defendant had shipped on the Belano under the name of Carl Nelson, but his true name was Emil Totterman. Proof was given tending to show that such name and the words "Fred B. Belano," written on the shoe box, were in the handwriting of the defendant. A chemical examination of spots on the trousers of the defendant, worn at the time of his arrest, and on a knife then found on him, disclosed that they were caused by human blood. No evidence was given for the defense.

From this summary of the evidence it would seem impossible to doubt that the defendant was the man who accompanied the deceased to the room in the James slip house on the night of the homicide. It seems equally impossible to doubt that the man who accompanied her on that occasion was the man who caused her death. He left stealthily, no one discovering that he had gone out. He left his bundle there. No one else had access to the room. Indeed, counsel for the appellant does not contend on this appeal that the evidence failed to prove that the defendant committed the homicide. His sole claim is that it was insufficient to establish the premeditation and deliberation required under the statute to constitute murder in the first degree. This claim we deem destitute of merit. Without arguing it we can say that the nature and repetition of the wounds

with the knife, as well as the strangulation of the deceased, were amply sufficient to justify the verdict in this respect.

The trial was eminently fair, the charge to the jury accurate in law and absolutely impartial. The case is exceptionally free from claim of error. The few exceptions taken to the rulings of the court were without merit and have not been argued here. The verdict was warranted by the proof and the judgment entered thereon should be affirmed.

O'BRIEN, BARTLETT, HAIGHT, VANN and WERNER, JJ., concur; GRAY, J., absent.

Judgment of conviction affirmed.

### NATURE OF WOUND AS EVIDENCE OF INTENT, PREMEDITATION AND DELIBERATION.

The Court of Appeals has repeatedly pointed out that the elements of premeditation and deliberation can be inferred by the jury from the nature and character of the wound, as, for example, where the throat was cut (see People v. Hamilton, 137 N. Y. 531; 10 N. Y. Crim. 297; People v. Leach, 146 N. Y. 392; 11 N. Y. Crim. 165; People v. Cornetti, 92 N. Y. 85; 1 N. Y. Crim. 303), where there were hammer wounds on the head (People v. Schmidt, 168 N. Y. 568, 574; 16 N. Y. Crim. 111, 116), or blow with heavy instrument like a butcher cleaver (People v. Sliney, 137 N. Y. 570; 10 N. Y. Crim. 303), or stab with blunt cigar box opener (People v. Fish, 125 N. Y. 136, 147; 8 N. Y. Crim. 129, 137).

In the Ferraro case, where a razor was used, the Court said generally: "The nature of the weapon, the manner of its use and the place where the blow was struck are facts of the highest importance" (People v. Ferraro, 161 N. Y. 365, 374; 14 N. Y. Crim. 266, 274). In the Schmidt case, where the defendant struck his victim with a hammer on the head, the Court said: "The weapon used and the vital part of the body on which the blow was inflicted justified the jury in finding that the defendant intended to take life." (People v. Schmidt, 168 N. Y. 568, 574; 16 N. Y. Crim. 111, 116.)

Similar remarks have been made with regard to shot wounds, particularly with regard to shots in the back, or shots which obviously could not have been self-inflicted. (See generally People v. Gaimari, 176 N. Y. 84, 17 N. Y. Crim. 490; People v. Koepping, 178 N. Y. 247; 18 N. Y. Crim. 251; People v. Burness, 178 N. Y. 429; 18 N. Y. Crim. 337.)

In this Totterman case one of the means of death was suffocation. In two interesting New York cases, in each of which a woman was strangled to

death, the Court held that premeditation and deliberation could properly be inferred by the jury, in view of the fact that in order to consummate strangulation a period of at least two or three minutes was required. (People v. Pullerson, 159 N. Y. 339; 14 N. Y. Crim. 95; People v. Koenig, 180 N. Y. 155.)

The importance of evidence as to the nature and character of the wounds cannot be overestimated. Ordinarily the only way in which it can be told that the deceased has met death by criminal means is from the appearance of the body.

The discovery of the body with the unmistakable marks of murder upon it establishes the *corpus delicti*. Thus, in cases where the defendant has confessed and where it is necessary that the confession, under section 395, Code Crim. Proc., should.be supported by " additional proof that the crime charged has been committed," it has been held that the discovery of the body with the unmistakable marks of murder upon it is sufficient additional proof. (People v. Deacons, 109 N. Y. 374; People v. White, 176 N. Y. 331; 17 N. Y. Crim. 538; People v. Burness, 178 N. Y. 429; 18 N. Y. Crim. 337, and People v. Pekarz, 185 N. Y. 470.)

## INDETERMINATE SENTENCE CASES.

PRELIMINARY NOTE.—The questions arising in connection with inde-terminate sentences are not a little complicated. The difficulty lies in the fact that the indeterminate sentence provisions have been, to some extent, involved with the provisions for statutory commutation (under L. 1886, chap. 21); and, again, because the Indeterminate-Sentence-Law has been repeatedly amended.

The original provisions for the indeterminate sentence of adult convicts were contained in the Prison Law, L. 1889, chap. 382, §§ 74, et seq. These provisions were known as the " Fassett Law," and are referred to as such by the Appellate Division, Second Department, in ex rel. Ammon, infra.

At first indeterminate sentences could be imposed under this § 74 of the Prison Law in the discretion of the judge. This arrangement lasted for about 12 years. Then, by L. 1901, chap. 425, the old § 74 of the Prison Law was transferred into the Penal Code, where it became § 687a; and was, furthermore, so amended as to make it mandatory to impose in-determinate sentences in certain cases of first offenders whose maximum terms were 5 years or less. In the next year, 1902, § 687a was amended so as to make it discretionary to give an indeterminate sentence in certain cases where the maximum exceeded 5 years. (L. 1902, chap. 282.) Prior to 1901, but few indeterminate sentences had been imposed, and these amendments showed the intent of the Legislature to force the courts to impose them in the case of first offenders. (Consult reports of Prison Com-mission in ex rel. Schali briefs, 181 N. Y. 425.)

The original indeterminate sentence enactments provided that nothing therein contained should affect the prisoner's right to commutation; and it was found that much confusion resulted from the circumstance that a prisoner who got an indeterminate sentence was also entitled to statutory commutation. As a result, the Commutation Law (L. 1886, chap. 21) was amended, as of April 6th, 1903, so as to provide, for the future, that commutation should not be enjoyed by persons who received indeterminate sentences, but only by persons who had received definite sentences. (L. 1903, chap. 137.)

The construction of this provision was discussed in the cases of ex rel. Adams, and ex rel. Schali, infra.

The reader, in order to avoid confusion, must always bear in mind that the Adams and Schali and other opinions, are, to some extent, of mere temporary value. Whenever a man is sentenced for a crime committed prior to April 6, 1903, he may be entitled both to statutory commutation and likewise to the benefits of an indeterminate sentence. There will be

cases of this kind, no doubt, for a number of years. If, however, the crime is committed after April 6, 1903, the prisoner, if he receives an indeterminate sentence, is not entitled to commutation, and no confusion will result, such as was involved in the Adams and Schali matters.

As a result of this 1903 amendment, § 697 of the Penal Code, which provides that sentences shall expire in the summer months, became inapplicable to indeterminate sentences. By its latest amendment, L. 1906, chap. 36, the Legislature amended § 687a of the Penal Code so as to provide that the maximum of an indeterminate sentence shall be so limited as to expire in the summer months. As yet, no question has arisen as to the meaning of this latest amendment.