## COURT OF APPEALS.
### June 1907.

# THE PEOPLE *v.* FRANK FURLONG.

### (187 N. Y. 198.)

**(1). MURDER—INSANITY—SUFFICIENCY OF EVIDENCE.**

The evidence upon the trial of an indictment for murder examined, particularly that relating to a defense that the crime was committed while the defendant was under the influence of epileptic furor, and *held*, that it was not only sufficient to sustain a verdict convicting him of the crime of murder in the first degree but that there was no reasonable doubt that the homicide was committed by him and that he knew the nature and quality of the act he was doing and that the act was wrong.

**(2). EVIDENCE—ADMISSIBILITY OF STATEMENTS MADE BY DEFENDANT TO MEDICAL EXPERT WHO EXAMINED HIM DURING THE TRIAL AND SUBSEQUENTLY RELATED THEM TO JURY—USE OF MINUTES OF STENOGRAPHER WHO ATTENDED EXAMINATION IN INTERROGATING EXPERT.**

Statements made by defendant to a medical expert who, at the request of the court, had examined him after warning him that his answers to questions might be used against him, and subsequently related to the jury by such expert, are not incompetent as within the constitutional prohibition against compelling a defendant to give testimony against himself; nor does the fact that several of the questions to and answers by the defendant were read to the jury from the minutes of a stenographer who had attended the examination, after such expert had sworn that the questions were so put to the defendant and answered by him, instead of the 'witness giving separately each question and answer from his unaided memory or after refreshing his recollection, constitute error.

**3. REASON FOR EXCLUSION OF DEFENDANT'S STATEMENTS AS TO TRANSACTIONS PRIOR TO TIME OF TRIAL, NOT APPLICABLE TO TRIAL IN BEHALF OF PEOPLE.**

While unsworn statements by the defendant as to transactions prior to the time of the trial cannot be given in evidence in his behalf to be used as a basis for an expert opinion as to his sanity

at the time of the commission of the crime, the reason for excluding such testimony is not applicable where the statements are for use on a trial, in behalf of the people.

APPEAL from a judgment of the Court of General Sessions of the Peace in the county of New York, rendered January 30, 1905, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*John F. Cowan* for appellant. The evidence of conversations between the witness Flint and the defendant was incompetent as compelling the latter to be a witness against himself. (*People* v. *Kemmler,* 119 N. Y. 580; Const. N. Y. art. 1, § 6; *People* v. *Mondon,* 103 N. Y. 221.) The admission of such conversation as bearing upon defendant's mental condition at the time of the homicide was irrelevant and improper. The uniform rule is that the result of interviews by an expert with a defendant is only competent where it is asserted that the defendant has been continuously insane from a period prior to the killing and up to the time of the examination. (*People* v. *Nino,* 149 N. Y. 317; *People* v. *Hawkins,* 109 N. Y. 408; *People* v. *Strait,* 148 N. Y. 571; *People* v. *Lake,* 12 N. Y. 358.)

*William Travers Jerome, District Attorney* (*Robert C. Taylor* of counsel), for respondent. The testimony of Dr. Flint was competent. (*People* v. *White,* 176 N. Y. 331; *People* v. *Gardner,* 144 N. Y. 119; *People* v. *Truck,* 170 N. Y. 203; *People* v. *Van Wormer,* 175 N. Y. 188; *People* v. *Mills,* 178 N. Y. 274; *People* v. *Adams,* 85 App. Div. 390; 176 N. Y. 351; *Adams* v. *City of New York,* 192 U. S. 585.) The admission of the defendant's conversations with Dr. Flint was proper. (*People* v. *Hoch,* 150 N. Y. 291; *People* v. *Carpenter,* 102 N. Y. 238; *People* v. *Hawkins,* 109 N. Y. 408; *People* v.

*Nino,* 149 N. Y. 317; *Austin* v. *Bartlett,* 178 N. Y. 310; *Connolly* v. *B. H. R. R. Co.,* 179 N. Y. 7; *People* v. *Wolf,* 183 N. Y. 464; *People* v. *Silverman,* 181 N. Y. 235.)

CHASE, J.:

The defendant has been convicted of the crime of murder in the first degree in having killed Margaret Keeler. The brief filed in the defendant's behalf on the appeal to this court commences with the following statement: " There is no dispute as to the facts and circumstances of the homicide. They would justify the conclusion that the homicide was either a brutal murder, or the act of a lunatic."

On the 28th day of November, 1904, Margaret Keeler lived with her husband and two children in one of three apartments on the second floor of No. 82 East 115th street in the city of New York. On that morning her husband left the house at ten minutes before seven o'clock and did not return until after the homicide. After her husband left she called her two children and served their breakfast, and they then went to school. One of the children left the house for school about twenty-five minutes before nine o'clock and he says that his mother was then helping his sister put on her coat and that his sister left the house a minute later than he did, leaving his mother alone in the house. The children returned from school that day about ten minutes after twelve o'clock, and found the doors of the apartment locked. The janitress of the building gave them some lunch and they returned to school. They returned to the apartment again about ten minutes after three o'clock. As they were then unable to get into the apartment they called the janitress, and the three tried to open the doors, but were unable to do so and they went into an adjoining apartment, and one of the children went on the fire escape to a window of the Keeler apartment and opened it, and so entered their kitchen. On the floor of the kitchen he found a pool of blood, and in the blood

were two combs that had been worn by his mother. He went into one of the bedrooms, and there he found his mother lying on the bed, dead. The kitchen door was locked and the key was in the lock. The parlor door was locked and the key had been removed. Mrs. Keeler lay on the bed with her face down, her head was toward the foot of the bed, in a pool of blood, and one of her feet was between the bars at the head of the bed. Her hair was down and matted with blood. The homicide was reported to the police, and they came to the apartment and found the pools of blood and the body of Mrs. Keeler as stated. The tablecloth on the table in the kitchen and the chairs near it had blood-stains and finger-marks on them, and near the pool of blood in the kitchen they found an iron bar on which were blood and pieces of human hair which resembled the hair of Mrs. Keeler.

The autopsy showed twelve lacerated and ragged wounds on the front and top of the scalp. Eight of these wounds extended through the scalp to the skull, and four of them included a compound comminuted fracture of the skull and lacerations of the brain. The fractures of the skull included compound comminuted fractures of the frontal bone and depressed fractures of the left parietal and left temporal bones. Her face was blackened over the eyes, and there was a lacerated wound over the second joint of the index finger of the right hand about one inch in length. Death was caused by the fractures of the skull and injuries to the brain. The wounds could have been made by the iron bar that was found by the pool of blood. The condition of the body at the time it was found indicated that death had occurred several hours before.

When Mr. Keeler left the house in the morning, Mrs. Keeler had earrings in her ears, two rings on her fingers, and there was on the sideboard in the apartment a purse with a small amount of money therein; and there was also in the apartment a watch and chain belonging to one of the children. When Mrs.

Keeler was discovered after the homicide, the ear and finger rings were missing, the money had been removed from the purse, and the watch and chain could not be found.

The defendant at the time of the homicide was about nineteen years of age. He was a nephew of Mrs. Keeler, and came to visit the Keelers occasionally, and when he did so Mrs. Keeler generally gave him his breakfast or his meal, or whatever he wanted.

On the morning of the homicide a woman who lived in one of the apartments adjoining that of Mrs. Keeler started about half-past nine o'clock to go from her apartment to the floor below, and when she arrived at the stairs in the hallway she met a young man whose description corresponds with that of the defendant. He went in the direction of the door of the Keeler apartment, and she heard him knock. The woman proceeded to the floor below and did not see any more of the young man. About twenty minutes past ten o'clock on the day of the homicide a young man, who had been accustomed frequently to meet and go around with the defendant, met him at 117th street and Third avenue in front of an oyster booth, where he was talking with a little boy. The defendant gave the boy a ten-cent piece, and then asked the young man who there met him to go into a saloon and have a drink with him. They went in the saloon and had a drink, and the defendant asked the others in the saloon, including the barkeeper, to have a drink. The defendant told the young man that he was going up to a poolroom, referring to a place where they had been accustomed to meet, and the young man met him there shortly afterwards, and they commenced playing pool together. The young man said that he noticed that the defendant was " acting kind of queerly " and that he asked him repeatedly what was the matter, without getting any reply, and that after asking him three or four times the defendant said " Oh! There is nothing the matter with me, just let me enjoy myself," and he

.afterwards said that defendant's words were " Let me enjoy my-
self to-day." He continued to ask the defendant what was .the
matter and the defendant showed him a spot on his trousers
.and said " That ought to tell you." The spot on his trousers
was above the knee on the left leg, and it was a dark red spot,
-and the young man said to the defendant " That don't tell me
.anything," and the defendant said " All right, never mind, come·
on and shoot pool." The defendant appeared to be sick and
went into the toilet and vomited, and the manager of the pool-
·room asked him what was the matter, and the defendant said
·" You will read about it in the papers to-morrow." He con-
tinued playing pool and showed the young man a pair of ear-
rings and a finger ring, and he said " There is nothing the mat-
ter only I have got to have some money." He asked the young
man to pawn them for him but the young man refused. After
remaining in the poolroom until about half-past three o'clock in
.the afternoon he went to a pawnbroker's and pawned the ear-
rings, giving the name of " Smith," and received fifteen dollars
thereon. During the afternoon a ring was pawned at the same
pawnbroker's, and at other brokers' in the same avenue another
ring and a watch and chain were pawned. The pawnbrokers
·who took the property other than the earrings were unable to
.identify the person from whom they received the property.
The earrings and the finger rings which the defendant showed
to· the young man in the poolroom on the day of the homicide
.and all the property mentioned as having been pawned were
fully identified as the rings and property taken from the Keeler
apartment. Mr. Keeler also testified that the iron bar found
in the kitchen had not been in the apartment prior to that day.

The defendant was not in the places where he had been ac-
·customed to spend his time after November 28th to December·
3rd, when he came into the poolroom where he had played pool
·on November 28th, hatless and wearing different trousers than
those that he had worn when he was there the last time, and

on leaving the poolroom he was arrested. The officers of the police department had been in constant search for him from the evening of November 28th until the time when he was arrested.

To the officer who made the arrest, and also to the officers at police headquarters, he talked freely. The officer who arrested the defendant asked him if he killed his aunt and he replied, "No, I didn't do anything." But he admitted to the officer that he had taken the rings and jewelry from his aunt and pawned them. At the police headquarters he was questioned by a detective sergeant in the presence of two other officers. The defendant was first told that anything he might say would be used against him in court. The examination was taken by a stenographer, and after it was typewritten the defendant read it over and signed it. In that statement he said that he took the earrings out of the ears of Mrs. Keeler and the rings from her fingers while she was lying on the floor of the kitchen in her apartment. He also said that he took thirty-seven cents out of a pocketbook which he found on the sideboard in the bedroom off the parlor, and that he took the silver watch from the drawer of the dresser in the same bedroom where he got the money. He said he went out of the door of the apartment and took the key and put it in his pocket, and then went to the saloon at 117th street and Third avenue, and he stated with some detail what he did there and at the poolroom. He told about pawning the jewelry and watch, and of showing the bloodstains on his trousers to the young man who was at the poolroom with him, and he also said that after pawning the articles he went down to Houston street and exchanged the trousers that had the bloodstains on them for another pair that he then put on and that he obtained another hat.

The following questions and answers were among those taken on such examination, viz.: " Q. Where was the children of Mrs. Keeler when you struck her? A. They were at school. Q. Did

Mrs. Keeler speak when you left the house? A. No, she was groaning. Q. What time was it when you went into Mrs. Keeler's? A. It was after nine o'clock A. M."

He made a further statement to an officer after the officer had again stated to him that anything he said might be used against him in court. This statement was made with great detail and in it he told where he had pawned the different articles and the amount he received for each pawn; he also told of using the name " Smith " at one of the places, and the name " Curtis " at the other places. This statement included the following questions and answers: " Q. Did you have any trouble with Mrs. Keeler? A. I don't know that I had any trouble with her; I was drunk. Q. Did you have the iron bar with you? A. I suppose that I did, but I don't know. Q. Did you strike Mrs. Keeler? A. I struck Mrs. Keeler. Q. What did you strike her with? A. With the bar I guess? Q. Was there any blood on her? A. There must have been blood for I had some on my hands. Q. Was she lying on the floor when you took this jewelry? A. Yes. Q. When you left the house did you lock the door? A. Yes, and took the key with me. Q. How many times did you hit Mrs. Keeler? A. I don't know. Q. Did you search other rooms for other property? A. Yes."

At another time the officer showed him the iron bar that was found in the Keeler apartment, and asked him if it was the bar that he struck Mrs. Keeler with, and the defendant said, " Well it looks like it; must be if you found it there."

Soon after he was arrested he said to an officer, " I made up my mind that I would get a good feed before I got arrested." The officer said, " Where did you get it? " And the defendant said " I went in Thornton's restaurant and I ate about sixty cents' worth and then I asked the waiter if he had any tobacco that could make cigarettes and the waiter brought me two bags of tobacco and then I had no money in my pocket, I went over the cashier and said ' Excuse me, I'm going out for a

paper,' " and he said, " I run away leaving my hat. I ran down Third Avenue, and I got down to the poolroom; I knew I was going to get collared the minute I went in there, but I didn't care."

The defendant did not present a formal plea of insanity, but his counsel claims that it was agreed by the district attorney that testimony relating to the sanity of the defendant should be admitted as if the plea had been actually entered, and testimony was so received.

Counsel for the defendant claims that the homicide was committed while the defendant was under the influence of epileptic furor. The defendant's mother had an attack about two months after the birth of her first child, and prior to the birth of the defendant, which is characterized by lay witnesses as an epileptic fit. She became suddenly unconscious and had violent convulsions and frothing at the mouth. Between that time and the birth of the defendant she had six or eight such attacks, two within a few months before the defendant was born. The defendant when nine years old had a similar attack, and about three to six months thereafter a second similar attack. On several occasions between that time and the time of the homicide defendant was seen in a temporarily unconscious or semi-conscious condition with staring eyes and twitching of the muscles of the face. The defendant also when a small boy had a blow on his head with a piece of iron which raised a large lump and he complained of pain in his head for about a week thereafter. His mother died in 1900, but prior to his mother's death he had commenced working as a messenger boy, and he worked at various work and at different places, but irregularly, until the time of the homicide. He lived in boarding houses and lodging houses. From the time he was about twelve years of age he had smoked cigarettes almost constantly. Some of the witnesses in his behalf testified that they had known him for years and never saw him without a cigarette in his mouth, and that he

would get out of his bed in the night to puff on a cigarette for a few minutes before returning to bed. He drank whiskey and other liquors freely. He was addicted to sexual abuses and excesses and sodomitical practices. No physicians were called on behalf of the defendant but several witnesses were called who had been acquaintances of his and they testified to his constant smoking of cigarettes and to his other habits. They also testified to his being generally melancholy and disinclined to associate with or have conversations with others and that he frequently had to be asked several times before answering a question. When he came to the poolroom on the day he was arrested he said in response to a question as to where he had been that he had been flying over roofs, houses and fences.

The witnesses called in his behalf, and one or more of the witnesses for the People testified that the acts, practices and appearances detailed impressed them as irrational. The People then called the official physician at the prison where the defendant was confined after his arrest and until his trial, who testified that he had examined and observed the defendant while he was at the prison and had talked with him frequently, and that he found him physically and mentally normal, and that he was rational.

Dr. McDonald, a well-known expert in cases of insanity and mental diseases, was sworn and testified that epilepsy is a chronic disease of the nervous system, and that it is divided by physicians into three forms; the first and second forms are characterized by sudden loss of consciousness and muscular convulsions or spasms. The second form differs from the first mainly in degree. The third form of epilepsy is known by physicians and writers as psychic or mental epilepsy. Referring to this form of the disease, the witness said: " The patient, instead of having an attack of grand mal, has a sudden outburst of maniacal fury, so to speak; a blind, motiveless fury in which he attacks those about him right and left, animate and inani-

mate, without any motive, and when he emerges from that con-
dition has no recollection of what has occurred; his mind is a
complete blank while it is in what we term the epileptic state."
He further said: " A person suffering from or having passed
through such a state would have no recollection of it whatever,
and any knowledge that he had of it would have to be derived
from outside sources." He testified that a convulsive seizure
by itself would not be positive evidence of epilepsy; that acute
indigestion and pressure on the heart, and many other things,
may produce an epileptic form of seizure that is not in fact
epilepsy, just as children in teething and persons suffering from
Bright's disease have epileptic convulsions that are not epilepsy.
At the request of the district attorney he gave the defendant a
physical examination in the presence of counsel for the defend-
ant, and he also questioned him as to his history and habits and
his recollection of the homicide. Before questioning him, the
defendant was told that if any question was asked that he did
not wish to answer, or the answer to which might harm him on
the trial, he had a right to decline to answer. After the exam-
ination the witness testified that he did not find any physical in-
dications of mental or nervous disease and that in his opinion
the defendant was normal and entirely rational. He further
testified in answer to a hypothetical question summarizing the
testimony given on the part of the People that it did not indicate
any degree of epileptic mania at the time the homicide was
committed, and that the defendant in his opinion had capacity
to understand the nature of the act and to know that it was
wrong. He was then asked a similar question adding a sum-
mary of the testimony produced on behalf of the defendant and
he gave a similar answer, and in answer to a similar question
on behalf of the defendant including a summary only of the
defendant's testimony he gave a similar answer.

The father of the defendant while giving testimony in this
case fainted. Dr. McDonald was present and thereafter ex-

amined him, and he testified that the attack is known as syncope and that it was not epileptic in any of its characteristics.

Dr. Flint, another physician of great experience in mental diseases, was called as a witness by the People. Before he was called as a witness he had, in the presence of Dr. McDonald, given the defendant a physical examination and had questioned him in regard to his history, habits, education and also generally to ascertain his mental processes. He testified that before examining him he had said to him: " I thought it was for his interest to answer questions unreservedly and truthfully; that he might decline to answer any question that I might put to him, and   *   *   *   that while I was examining him in the interests of the court and not as either for or against him, that anything he said in answer to my questions might be used against him."

The examination was not made either at the request of the defendant or of the district attorney, and neither the district attorney nor the defendant's counsel was present at the examination or knew that it was to be held. Dr. Flint says that he was informed by some one that the court desired him to make the examination, and that the defendant was brought to the room where the examination was held and that he made the examination and questioned the defendant to ascertain the truth in regard to his claim of insanity. After detailing the physical examination and the conversation had by him with the defendant he testified " Neither in the account he gave of himself or his history, nor in his appearance nor as the result of my physical examination was there any evidence that he was an epileptic." He was then asked the hypothetical questions which were propounded to and answered by Dr. McDonald and he gave substantially similar answers. He further testified that a person has no memory of anything that occurs during a psychic or epileptic seizure. The attacks of the defendant's mother were described to him and he said they were not epi-

leptic; but that they were hystero convulsions without the characteristics of epilepsy.

All of the questions relating to the defendant's guilt and responsibility for the crime were submitted to the jury by the court, with a charge in which every request made by the defendant's counsel was granted, and to which no exception was taken, except in one unimportant particular, and they have found against him. Although it is not contended by the defendant's counsel that the evidence, if properly received, is not sufficient to sustain the verdict, we have, in view of the serious consequences to the defendant, reviewed the evidence to show that it is not only sufficient to sustain the verdict, but that there can be no reasonable doubt that the homicide was committed by the defendant, and that he knew the nature and quality of the act he was doing, and that the act was wrong. (Penal Code, section 21.) The jury could have found that the defendant took the iron bar to the apartment for the purpose and with the intention of using it in committing the crime. Deliberation and premeditation are shown in his providing himself with the iron bar, and in the nature and number of the wounds inflicted upon Mrs. Keeler. (*People v. Totterman,* 181 N. Y. 385, 19 N. Y. Crim. 412.) His need of money, as well as his confirmed smoking habit are shown by evidence that while at the poolroom, he was accustomed to gather the discarded ends of cigarettes and lay them away to smoke at times when he did not have money to buy cigarettes, or tobacco with which to make them.

There can be no sufficient motive for so brutal and serious a crime, but sometimes a comparatively trivial thing is magnified to such an extent that to accomplish or attain it a person will deliberately take human life. The robbery and larceny by the defendant do not seem to have been an afterthought, but a part of the purpose for which he entered the apartment, and the jury could have found the verdict based upon the deliberation

32

and premeditation with which Mrs. Keeler was killed, and also upon the defendant's commission of the crime while engaged in a robbery and larceny affecting the person of Mrs. Keeler. The defendant's full consciousness of his acts in committing the crime is shown in the detail with which it was done; his taking the earrings and finger rings from his victim's person; the search of the house for other property upon which to secure money; his locking the doors and carrying the key away with him; his showing the blood-stains on his trousers, that could not be removed like the blood on his hands; his statement to the young man in the poolroom that he had " got to get some money; " and to the manager of the poolroom that " you will read about it in the papers to-morrow; " his pawning the property stolen; his avoiding the police for five days, and his knowledge that he would be arrested as soon as he returned to his old haunts. The claim of his counsel that the crime was committed while affected by epileptic furor, or mental epilepsy, has absolutely nothing on which to rest.

The uncontradicted testimony is that when a person commits a crime under the influence of such a furor, or mental epilepsy, he is not guided by intelligence or affected by motive, but the act is carried out wholly under the influence of such furor and without any recollection whatever of what thus occurs. All of the testimony relating to the act shows intelligence and knowledge, and his full recollection of the facts and deliberate effort to enjoy the fruit of his crime are convincing evidence of responsibility for the crime.

The only exceptions taken by the defendant that are urged before us relate to the examination of the defendant by Dr. Flint during one of the adjournments of the court, while the defendant was on trial, and also to the subsequent testimony of Dr. Flint, in which he related to the jury the conversation which he had with the defendant, and described what he found upon a physical examination. It is claimed in behalf of the

defendant that such examination was obtained by entrapping the defendant, and that it was generally unfair and prejudicial to him, and that he was thereby compelled to give testimony against himself in violation of his constitutional rights, and also that unsworn statements by the defendant as to acts at a date prior to the time of the examination cannot be used as a basis on which to express an opinion as to the defendant's sanity at the time of the homicide.

The record does not disclose any justification for the claim that Dr. Flint was used to entrap the defendant into making a statement for use against him on the trial. There is no denial of the testimony that Dr. Flint examined the defendant after being told that it was requested by the court, and that the examination was made without the knowledge or presence of either counsel. We are not to pass upon the question whether due courtesy was shown to the counsel engaged in the trial in holding the examination without notifying them.

The fact that several of the questions to and answers by the defendant were read from the minutes of the stenographer after the witness had sworn that the questions were so put to the defendant and answered by him, instead of the witness giving separately each question and answer from his unaided memory, or after refreshing his recollection, was not error or even a subject for criticism in the absence of any claim by the defendant's counsel at the time that such course should not be pursued.

The defendant was distinctly told that he might decline to answer any questions that were put to him, and that anything that he said in answer to questions might be used against him. It has been held by this court that where an under sheriff wormed himself into the confidence of a prisoner charged with murder, by making him believe that he was his friend and that he wished to help him, and thus by gross deception, but without threats, persuaded him to make disclosures, that such disclosures

can be received in evidence. The test is whether the prisoner had any inducement to tell a falsehood against himself or felt compelled to speak for any reason when he preferred to remain silent. (*People* v. *White,* 176 N. Y. 331, 17 N. Y. Crim. 538.)

The statement made to Dr. Flint was not within the Constitutional prohibition against compelling a defendant to give testimony against himself. (*People* v. *Truck,* 170 N. Y. 203, 16 N. Y. Crim. 342; *People* v. *Gardner,* 144 N. Y. 119, 9 N. Y. Crim. 404; *People* v. *Van Wormer,* 175 N. Y. 188, 17 N. Y. Crim. 359; *People* v. *Mills,* 178 N. Y. 274, 18 N. Y. Crim. 269; *People* v. *Adams,* 85 App. Div. 390; affd., 176 N. Y. 351, 17 N. Y. Crim. 466; affd., 192 U. S. 585.)

The statement made by the defendant was properly received in evidence as an admission or for the purpose of showing that defendant's statements made at different times were contradictory and inconsistent. (*People* v. *Hughson,* 154 N. Y. 153, 12 N. Y. Crim. 485.)

The evidence was not incompetent because of the fact that the witness was a physician. (*People* v. *Hoch,* 150 N. Y. 291, 11 N. Y. Crim. 488; *People* v. *Koerner,* 154 N. Y. 355, 12 N. Y. Crim. 503.)

The authorities cited by the appellant to show that unsworn statements by the defendant as to transactions prior to the time of the trial cannot be given in evidence for use on which to base an expert opinion as to the sanity of the defendant at the time of the commission of the crime all relate to testimony offered in behalf of the defendant. Such testimony if allowed would permit a defendant to prepare his statement to fit his particular case. The reason for excluding testimony so offered in behalf of the defendant does not apply where it is sought to show conversations and statements of a defendant for use on a trial in behalf of the people.

We do not find any error in the record, but a commendable care and consideration for the rights of the defendant.

The judgment of conviction should be affirmed.

EDWARD T. BARTLETT, J. (dissenting).

On the fifth day of the trial and during the noon recess, while the district attorney was putting in his proofs in rebuttal, Dr. Flint, a distinguished mental expert, was permitted to examine the defendant without the knowledge of his counsel and in the presence of Dr. McDonald and one other person. Dr. Flint testified: " I examined the defendant, as I said before, between one and two yesterday afternoon in the presence of Dr. McDonald and in the presence of the stenographer and one other person, I think." Under cross-examination Dr. Flint stated: " I was told that I was ordered or authorized to examine the defendant by the court, and that the defendant was brought up for examination. It may have been a court attendant. I do not remember who told me that. * * * I do not know who told me to go there. Some one told me that the defendant was to be brought to a room and I was to examine him."

The fair inference from this and other testimony in the case is that this hasty examination during the noon recess was at the instance of the district attorney and in the presence of a stenographer furnished by him to expedite matters. There was of course no objection to Dr. Flint examining the defendant at the request of the district attorney. It is also clear that the expert was at liberty, after having cautioned the defendant, as he did, that he was not obliged to answer any question asked him unless disposed to do so, as it might be used against him, to have propounded to him such interrogatories as he deemed essential in order to pass upon the question of his condition as to insanity, epilepsy, or other mental malady.

This course, in part, the expert pursued, and he was thereafter placed upon the stand and examined by the district attorney at the outset in the usual manner. Dr. Flint stated that he had asked various questions of the defendant, going into detail as to the character of many of them. He was then re-

quired to answer two lengthy hypothetical questions, after which he stated his opinion as to the mental condition of the defendant at the time of the homicide. The counsel for the defendant then cross-examined the witness. There had been no departure up to this point from the usual practice in the examination of expert witnesses as laid down by many cases in this court, some of which appear upon the briefs and in the prevailing opinion.

The district attorney then continued his examination of Dr. Flint on the redirect. He held in his hand certain stenographic minutes which the witness testified were a correct transcript of a portion of his examination of the defendant. The defendant's counsel had previously objected and excepted to the entire examination of the defendant by the expert on the ground that it was in violation of the defendant's constitutional rights and an extra judicial examination. The question of objection and exception is of no importance on the present appeal. When the stenographer's minutes were produced as above stated, the defendant's counsel took the additional objection and exception that the conversation with the defendant was not in a form to be produced upon the trial. The district attorney then asked: " Did you ask him the following question and did he so answer as I shall read ? " Thereupon for nearly three pages of the printed record the district attorney repeated the above question before reading each question and answer and received an affirmative reply from the witness. These answers, in the main, were highly prejudicial to defendant.

I venture to say that there is no case in this state, or in any jurisdiction under the common law, where such a practice has been sanctioned. It was of course competent, as I have before stated, for the expert to propound such questions to the defendant as he saw fit and base his opinion thereon. It was also proper when the expert was on the stand for counsel upon either side to examine him in detail as to the questions he pro-

pounded and the replies elicited. In other words, his memory could be thoroughly searched and tested on direct and cross-examination. The production of pages of stenographic minutes, read to the witness by separate question and answer as stated, is to lead the witness and relieve him from any effort to reproduce his examination of the defendant by the usual act of memory to which witnesses are subjected entirely unassisted by stenographer's minutes. The effect upon the jury of reading the stenographer's minutes in their presence was equivalent to placing the defendant upon the stand and compelling him to testify against himself.

If a portion of the examination made by the expert can be read from the stenographer's minutes, it follows that the entire examination may be embraced in the minutes and so read. It is impossible to draw the line.

It appears that the defendant was destitute of means and counsel was assigned him by the court. His sole defense was insanity or mental unsoundness. He had no money with which to employ experts, and was, consequently, wholly dependent upon such lay witnesses as he could produce capable of testifying as to his mental condition. The homicide in question was either a brutal, motiveless murder, or the act of an irresponsible man; there is no middle ground. I do not mean to intimate that either the distinguished alienist or the learned district attorney were impelled by improper motives, but I insist that the mode of procedure here disclosed was illegal, irregular and highly prejudicial to the rights of the defendant.

I vote for reversal and a new trial.

CULLEN, Ch. J., GRAY, O'BRIEN, WERNER and HISCOCK, JJ., concur with CHASE, J., EDWARD T. BARTLETT, J., reads dissenting opinion.

Judgment of conviction affirmed.