(No. 16071.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. WALTER KRAUSER, Plaintiff in Error.

*Opinion filed February 17, 1925.*

1. CRIMINAL LAW—*when instructions as to manslaughter are properly refused.* Instructions as to manslaughter are properly refused in a trial for the murder of a policeman, who was shot during a struggle for the defendant's revolver when the latter was attempting to rob a store, even though the revolver may have been in the hand of the policeman at the time it was discharged, as the homicide may reasonably have been anticipated by the defendant when he attempted to rob at the point of a revolver, and the crime must be held to be murder and not manslaughter.

2. SAME—*physicians may testify as to examination of defendant in rebuttal of insanity plea.* Where insanity is set up as a defense to a criminal prosecution, physicians may testify in regard to facts disclosed at a physical and mental examination of the accused either prior to the trial or during an adjournment, and testimony as to the defendant's statements during such examination does not violate his constitutional privilege not to be a witness against himself, provided the testimony is limited to the sole question of the defendant's mental condition.

3. SAME—*witness may refresh memory by use of memorandum.* A witness can testify only to such facts as are within his knowledge and recollection, but he is permitted to refresh his memory by the use of a written instrument, memorandum or entry in a book, whether or not the writing was made by the witness himself or was an original writing, provided that after inspecting it the witness can speak to the facts from his own recollection.

4. SAME—*stenographers may read from notes taken during examinations of defendant on question of insanity.* Where the defendant sets up insanity as a defense to a prosecution for murder, a stenographer who took notes during an examination of the defendant at the police station immediately after his arrest, and the reporter who took down the proceedings at the inquest, may read from their notes, provided the evidence is offered solely for its bearing upon the question of the mental condition of the defendant as disclosed by the examinations.

5. SAME—*non-expert witness must state facts upon which he bases his opinion as to sanity of defendant.* Although the facts disclosed and the circumstances which took place during an examination of the defendant at the police station immediately after

his arrest are testified to by other witnesses, it is error to permit a non-expert witness, in rebuttal of the defense of insanity, to give his opinion of the defendant's mental condition as disclosed by such examination without requiring him to state in particular what facts are taken by him as a basis for his opinion, so that the jury may judge of its reasonableness.

6. SAME—*when physicians may give opinion that defendant is feigning insanity.* Where physicians testifying for the prosecution in rebuttal of the defense of insanity have expressed their opinion that the defendant is neither insane nor feeble-minded, it is not error to permit them to further state that the defendant is falsifying and feigning insanity.

7. SAME—*statement of defendant is admissible on question of insanity regardless of whether it was voluntary.* A statement of the defendant, made at the police station immediately after his arrest, may be admitted in evidence in rebuttal of his defense of insanity, regardless of whether it was voluntarily made or was made under hope of favor or fear of punishment.

8. SAME—*what degree of insanity is necessary to an acquittal— instruction.* The ability to judge or to know right from wrong and the power to choose between them are equally necessary to criminal responsibility and the lack of either will warrant an acquittal where the defense of insanity is set up, and it is error to instruct the jury that there must be a want both of knowledge and the power of choice.

9. SAME—*what instructions should not ignore defense of insanity.* Where the defendant has set up insanity as a defense to a criminal prosecution, it is error to give instructions directing a verdict of guilty or defining implied malice without reference to the question of the defendant's sanity.

10. SAME—*instruction should not place upon defendant the burden of proving insanity.* Where the defense of insanity is set up it is error to instruct the jury that "in order to find the defendant not guilty" the insanity must be so clearly proved as to raise a reasonable doubt of guilt, as such instruction imposes on the defendant the burden of proving insanity whereas the burden is on the prosecution to prove the sanity of the accused.

11. SAME—*when evidence is sufficient for acquittal on ground of insanity.* To justify an acquittal on the ground of insanity it is only necessary that there shall be evidence tending to prove insanity sufficient, in connection with all the evidence, to raise a reasonable doubt of the defendant's guilt.

12. SAME—*jury should not be instructed that reasonable doubt must be well founded.* The jury should not be instructed that they

must have a "well-founded" doubt of the defendant's guilt to justify an acquittal, as the law requires only a reasonable doubt, whether well or ill founded, and it is of no benefit to the jury in arriving at their verdict to add to the requirement of a reasonable doubt the requisite that it shall also be well founded.

13. SAME—*jury should not be instructed that they are to determine the credibility of witnesses under any and all circumstances.* The jury should not be instructed that they are to determine, "as reasonable and intelligent men," the credibility of any witness under any and all circumstances, as such instruction excludes any guidance from the court as to what considerations may be necessary or proper in determining the credibility of witnesses.

14. SAME—*penalty is not required to be warranted beyond reasonable doubt—instruction.* It is not error to refuse to instruct the jury that they must be satisfied, beyond a reasonable doubt, that the evidence justifies and requires the penalty fixed by them in their verdict, as it is only the question of guilt that is required to be established beyond a reasonable doubt while the question of punishment is committed by law to the discretion of the jury, to be determined from a consideration of all the facts proved, and is subject to revision by the court on motion for a new trial.

15. SAME—*what part of opinion of reported case should not be read in argument on question of insanity.* Where the defense of insanity is interposed it is error to read in argument to the jury a portion of an opinion in a reported case, consisting not of a statement of a proposition of law but merely of a quotation from the testimony of an expert in the case reported ridiculing the system of examination of the defendant, which was the same system that was used by the experts in determining the sanity of the accused in the case at bar.

FARMER and THOMPSON, JJ., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. OSCAR HEBEL, Judge, presiding.

WILLARD M. McEWEN, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Walter Krauser was convicted in the criminal court of Cook county of the murder of Ralph S. Souders, his punishment was fixed at death, and he has sued out this writ of error.

David W. Glass was manager of a store of the Atlantic and Pacific Tea Company at No. 5361 South Morgan street, in Chicago. He opened the store on December 19, 1922, at 7:30 in the morning. Ralph Souders, a police officer in plain clothes, who had been assigned as guard to watch the place, came about ten minutes later. The store was on the corner of Fifty-fourth street. It was about twenty-three feet wide and faced west on Morgan street. The entrance to the store was at the corner, facing southwest. Along the north wall were shelves and a counter. The cash register was near the center of the north wall. A partition about seven feet high extended across the east end of the room, forming a room about seven feet wide, whose length was the width of the store, which was used as a store room. Between 8:30 and 8:45 o'clock the plaintiff in error entered the store. He was followed immediately by another man, Bernard Grant. Souders was at that time in the back room. The plaintiff in error, with a revolver, walked up to Glass and told him to put up his hands. Glass did so. Grant went behind the counter to the cash register. About $20 was taken from it. The plaintiff in error told Glass to go to the back room, and as Glass did so the plaintiff in error told Souders to put up his hands. Souders put up his hands and walked slowly toward plaintiff in error, who said, "Keep them up; that is the law." The plaintiff in error called to Grant to come and "get the copper's gun," but before Grant could do it Souders made a spring for plaintiff in error's hand and a struggle for the gun began. Souders was broad-shouldered, five feet eight or nine inches tall and weighed about 175 pounds. He was between Glass and plaintiff in error, so that Glass could not see exactly

what occurred.  A shot was fired.  Glass got behind some boxes and then there were two more shots in rapid succession.  After the third shot Glass heard the two robbers run from the store.  He got up and found Souders lying on the floor.  Two of the shots had taken effect on him.  One had entered the abdomen, three inches below and two inches to the left of the navel, and had passed to the left under the skin for five inches and imbedded itself in the muscles on the left side.  The other entered two inches below and two inches to the left of the right nipple, passed through the heart and left lung and out between the fourth and fifth ribs at the back.  The clothing and flesh around the point of entrance into the body of the latter wound were powder-burned.  There were no powder burns around the former wound.  As he ran the plaintiff in error discarded his overcoat a short distance from the store.  It was picked up a few moments later.  A bullet had passed through the right sleeve, which was still smouldering where it was powder-burned.  The bullet entered the sleeve about nine inches from its edge, went through the muscle of the arm of the plaintiff in error and out the sleeve about six inches from its edge and four inches back of the point of entrance.  The revolver which was used was lying partly under Souders' body as he lay on the floor.  Grant and the plaintiff in error lost their caps in the fight and left them as they fell.  The three shots were from the revolver which the plaintiff in error had in his left hand.  Souders' revolver was not withdrawn from its holster.  From the fact that two of the shots resulted in powder burns and one did not, and that one of the two which showed powder burns caused a superficial wound to the plaintiff in error and the other a fatal wound to Souders, it may be reasonably surmised that Souders grasped for the gun and succeeded in turning it sufficiently to cause the wound in the arm of the plaintiff in error.  Souders was then pushed back so far that there were no powder burns from the second shot, which struck

him in the abdomen, and then closing in he was shot through the heart at close quarters, or it may be the second shot went through his heart, and the third, which followed immediately, struck him in the abdomen as he staggered back. Whatever was the sequence, Souders was shot and killed as he struggled with the two robbers.

The plaintiff in error was arrested at about two o'clock in the morning of December 20. He was in bed in a room in the Dover Hotel, where he had registered as Joe Brady. The Dover Hotel is nine or ten miles from the scene of the crime. His arm was wounded and had gauze and iodine on it. He was unable to employ an attorney and the court appointed counsel to defend him. The defense was that the plaintiff in error is feeble-minded, lacking mental capacity and not criminally responsible.

The plaintiff in error was nineteen years old in December, 1922. His mother testified about him: "Remember him getting up in middle of night and getting phonograph horn. He used to do all kinds of foolish things around house. He used to sing and holler and talk to himself at night. If he had any excitement in daytime you could always hear at night whatever he done in daytime. He always was nervous. He used to bite fingernails, pull his nose, and seemed to sit and dream. He never took interest in books. I asked him to look at something in the paper and he couldn't find it and asked me to find it for him. He would look at jokes and enjoy anything silly or playful. He liked people younger than himself but would be nice in company,—no bad language. He done so many peculiar things I can't remember half of them. I have an automobile which stands all propped up in the shed. I haven't taken it out for two years. I wouldn't let him run it. He would get up in the seat and take little Benny with him and would turn the wheels and imagine he was going and clank the horn and make a noise. He used to do that every day in summer time. When I asked him to chop wood he

would go down and chop maybe one piece and throw the ax in one corner and the piece of wood in another. He would never finish it but would leave it laying there and never bring it up. And with coal the same way. He'd say it was too heavy; he couldn't carry it; it hurt his back." It also appeared that someone dropped a stone on his head when he was seven or eight years of age, making a big cut and hurting him seriously. Later he was stabbed in the back by another boy. His mother testified: "He had headaches right along, always, but after he was stabbed he had headache every day. He was laid up a long time after that, walked sideways, dragged himself. He was stabbed pretty bad and lost an awful lot of blood. I gave him bromo-seltzer most of the time for headaches. He got used to it and could take it three or four times a day. It seemed to help him. * * * I let him have it for four or five years, if not longer." She testified the plaintiff in error graduated from the eighth grade at school. His first job was as errand boy when he was fourteen or fifteen years old. He quit because he always got dizzy and couldn't stand the work.

His brother, Charles, testified of the plaintiff in error: "Walter used to act kind of peculiar around the house. He played with children on the street far below his age. He played on their bicycles, played ball with them, marbles and all kinds of childish games. He used to act kiddish and foolish. He used to pick his nose and was always nervous. It seems to me a person in his right mind wouldn't do those things. My wife and I stayed at mother's house one night and my brother came in with a shoe in each hand. At a different time he took the horn off the graphophone and started to sing through it. There was no reason for him taking his shoes off to come into the house. He sang through the graphophone in early hours of morning, when everybody else was in bed. I called to him to go to bed and stop the noise. He said some day he is going to be

a singer on the stage. He would be solemn, not talk to anybody, sit on a chair, get up and go into next room, go down in front of the house and come back again, and keep doing it. I don't think a person in his right mind would keep on doing these things."

Other witnesses also testified of the habits and peculiarities of the plaintiff in error. His mother testified: "I used to send him to the store. I sometimes gave him money to buy something, but not much. I was afraid he wouldn't bring things right. I could trust him. He would never take any money from me."

Mrs. Krauser's brother, Louis, was insane and died at Dunning Hospital. Emma, the daughter of another brother, Herman, is feeble-minded. Herman was not much brighter than his daughter. Others of the family also lacked normal intelligence. Radio pictures of the skull of the plaintiff in error are in evidence. They show a thickening over the back of the occipital bone, encroaching somewhat upon the space that should be occupied by the part of the brain known as the cerebellum. The cerebellum has to do with the co-ordinating of impulses received from the rest of the brain. It has nothing to do with reason or judgment. The thickening of the bone at the back of the skull was probably the result of the blow which the plaintiff in error received on his head when he was seven or eight years of age. He was accustomed to the taking of large and frequent doses of bromo-seltzer. The prolonged and habitual use of bromo-seltzer tends to produce an impaired condition of the general health, which is accompanied by a lessened resistance on the part of the body to disease. There is nothing in the continued use of bromo-seltzer or in the thickened condition of the skull and meninges of the plaintiff in error upon which a conclusion may be based that he is insane. That the cerebellum has not been affected by the thickening of the skull and meninges is clearly evidenced by the physical activities of the plaintiff in error as shown in the evidence.

There was no lack of co-ordination of the muscles. Dr. James B. Littlejohn, testifying for the plaintiff in error, said that if a person had a cerebellum disease he could not run fast. The plaintiff in error ran fast from the scene of his crime. In the process of the commission of the crime there was apparently no lack of muscular co-ordination.

Dr. Harold N. Moyer and Dr. William J. Hickson, witnesses for the plaintiff in error, were by reason of their training and long experience well qualified to judge in matters relating to the mind. Each examined the plaintiff in error both physically and by questions and observations, to prepare himself to testify. Dr. Moyer subjected the plaintiff in error to the various physical tests of mental and nervous normality. In summing up the result of the physical examination he testified that he found nothing on which he could base an opinion, one way or the other, as to whether the plaintiff in error was sane or insane or feebleminded. He was in fairly good health, with a reasonably sound organic nervous system. Dr. Hickson testified that the test for the nervous response to a sudden stroke just below the knee-cap showed the resultant knee jerks to be exaggerated and unequal, which showed that there was some lesion somewhere in the nervous system. The result of this test did not show insanity, however; and furthermore, the resultant knee jerks were somewhat within the control of the plaintiff in error.

Dr. Moyer testified that the opinion which he formed of the plaintiff in error as the result of the mental tests to which he subjected him by questioning and observing him, was that he was of sub-normal—of feeble-minded—intelligence; that his judgment and reasoning powers were childish; that his mental age was somewhere between eight and nine years, which means that he had not developed beyond the normal mental development of a child between eight and nine years of age; that he had no real conception of right and wrong abstractly; that he had rudimentary no-

tions of right and wrong comparable to his mental age; that he understood the doing of certain things, such as the taking of money that was not his, is wrong. The doctor thought the plaintiff in error feeble-minded, and distinguished between feeble-mindedness and insanity in this: that a feeble-minded person is one who never had average development mentally, whereas a strictly insane person is one who did develop intelligence but lost his wits as the result of disease. The questions which were asked of the plaintiff in error by Dr. Moyer were designed, as Dr. Moyer thought, to test the mental age of the plaintiff in error. The doctor thought that he answered the questions truthfully in the main. Dr. Moyer had practiced his profession for forty-four years, most of which time he had specialized in nervous and mental disorders. The subject of the will power of the plaintiff in error did not enter into Dr. Moyer's test.

Dr. Hickson subjected the plaintiff in error to what is known as the Binet-Simon test of mental age. This test consisted of putting to the plaintiff in error certain psychological questions and tasks adopted by alienists throughout the world as being the best from all the questions being used by different alienists in many countries. The way of giving the test and manner of marking questions have been standardized, and the system has been used by thousands of psychologists and physicians upon thousands of children in practically all civilized countries. Of this test Dr. Hickson testified: "In my experience in psycopathic laboratory of the municipal court in past eight years I have opportunities every day to test out and see verification of different analyses I have made of subjects that come into my laboratory. Are having absolute daily confirmation, and am able to say from my experience that the system applied in testing Walter Krauser is a system that is proven by the different cases I have examined. Rush Medical College, the Psycopathic Hospital, juvenile court in Chicago, in juvenile courts in Denver, Detroit, New York City and Cincinnati,

are using the Binet-Simon system. They are using it in Boston very extensively in the juvenile court, and a lot of the preparatory schools are using it,—perhaps the largest schools in America. All insane hospitals and a number of courts are using it that I know of." Dr. Hickson's conclusion as the result of this test was that the plaintiff in error is feeble-minded. "He is nineteen years old and has the mind of a child of about nine years and one-fifth." He further concluded, apart from the Binet-Simon test, that the plaintiff in error is suffering from dementia præcox,— an hereditary form of insanity,—the most common form there is, found in about sixty-nine or seventy per cent of inmates of all insane asylums; an exaggeration or diminution of normal mental processes; a disturbance of the emotions. One suffering from dementia præcox may be screaming and pulling out his hair; another may lie like a log. Dr. Hickson testified that the emotions are the directing spirit of the mind, and that in his judgment the plaintiff in error showed lack of emotions of a fairly well established dementia præcox case. His emotions were at a low stage, his will power very weak. Will is a part of the emotions, and a man might have a very fine intellect and still not have will power enough to apply or use it. A man might even know he is doing wrong and not have will enough to withstand it. In Dr. Hickson's opinion the plaintiff in error did not appreciate the difference between right and wrong. He had not the will power to resist the will of another for two reasons: First, because of his feeble-mindedness; and second, he lacked good emotions, and therefore would not have the inhibitions that, even if he had no intelligence, would prevent him from getting into trouble.

Apart from any evidence in rebuttal, the jury may very well have concluded from the evidence that as the plaintiff in error had succeeded in graduating from the eighth grade in school at the usual age for graduation he was at least

of the mental age of ordinary children of the age of thirteen or fourteen years; that as he knew as a concrete thing that it was wrong to take money which did not belong to him he knew that he was doing wrong in engaging in the robbery; that as a concrete thing he also knew that it was wrong to kill a man, for he ran away rapidly just as soon as he had done so, and without going to his home went to a hotel and registered there under an assumed name; and that he was not obeying the will of another in the robbery, for he dominated the situation, assuming the task of subjecting the manager of the store, including the subjection of the policeman also when he appeared unexpectedly, without waiting for any suggestion by anyone, calling upon Grant to help in the disarming of the policeman. His acts were not the acts of one who did not know that the act in which he was engaged was wrong or who acted at the will of another. The jury might well have concluded that even though he had not reached the mental development that is normal to a young man of his age, yet he did know that what he was doing was wrong, and even though he may have been suffering from dementia præcox, yet it had not yet affected his ability to control his will or emotions or deprive him of the strength of will to resist an impulse to commit the crime in which he was engaged, aroused by his own disordered mind or at the suggestion of another.

In rebuttal Drs. Singer and Krohn, each of whom was qualified by long training and wide experience as an expert in nervous and mental diseases, testified. Before they testified, certain statements which the plaintiff in error had made as to the crime and some of his actions preceding and following the crime were placed in evidence in rebuttal, not as evidence of the crime but for their value as indicating the mental condition of the plaintiff in error, to be considered by the jury, along with the other evidence of his acts and conduct and the testimony of the experts, in determining whether he was insane or feeble-minded or

not. Drs. Singer and Krohn attended the trial and heard the evidence, and in rebuttal each stated as his opinion that the plaintiff in error was not insane or feeble-minded, basing his opinion on all the evidence that had been presented, except opinion evidence.

Dr. Singer, at the request of the State's attorney, examined the plaintiff in error on three separate occasions before the trial, the first two alone and the third in company with Dr. Krohn. The first examination was about the middle of January and lasted about two hours. Dr. Singer introduced himself and said that he had been sent by the State's attorney; that he understood the plaintiff in error had not been feeling well, and asked of what he complained. The plaintiff in error said that for about two years he had been having some uncomfortable feelings in his head, which he described as flooding,—a sort of darkness which would come over his head when he got up or lay down; that he had trouble with his nose; that it would always run; that he had been having headaches for two years following an automobile accident in which his head was injured; that the automobile had been stolen and they were driving fast because they thought they were being chased; that he had been arrested for it and had been brought into court a week later and had been permitted to go home, but that he did not know what had happened; that he had been arrested about three years before, which he guessed was for being drunk; that he didn't remember anything further about it. The information which the plaintiff in error gave was in answer to questions asked by the doctor. The doctor asked many questions about his family, his schooling, his past health, the place in which he was confined, the reason for his being there. Besides other information so elicited, the plaintiff in error said that he had one brother and one sister, both older than himself, and that his father was a street-car conductor; that the place where he was confined was a hospital and not a jail; that he was not there for

315—32

shooting a policeman; that his mother was going to fur-
nish bond; that bond was fixed at $3000. He said that he
had heard voices at night; that a short time before he had
heard his mother's voice; that he didn't know what the
voice said; that it asked him how he was, and he replied
that he was feeling fine; that he had heard birds singing
and bells ringing in his cell, which he supposed meant
Christmas; that he was not surprised to hear them. He ·
said there were five days in the week, and named five or
six of them, repeating one; that Wednesday came before
Monday; that there were twenty-eight days in each month
and ten months in a year. He counted from 1 to 20, leav-
ing out one or two numbers, and backward from 20 to 1,
leaving out four or five numbers. He gave nineteen or
twenty letters,—some in proper sequence,—as being the
alphabet. He was asked if five pencils could be bought for
twenty-five cents what two would cost, and he answered
correctly; and being asked what eight times nine was, he
said eighty. Twice during the examination he was asked
as to his age and date of his birth. The first time he an-
swered that he was eighteen and was born September 10,
1903. The second time he said he was nineteen and was
born in August, 1904. The doctor then made a physical ex-
amination of the plaintiff in error, making the various tests
of the reflexes of eyes and body, finding them equal on the
two sides of the body within quite a normal degree. His
movements in the use of arms and legs were free and easy.
His attitude was slouching. In a test consisting in having
him touch the tip of his nose with his finger, having his
eyes closed, he repeatedly brought his finger to the right of
his nose under the eye. The test was varied by having him
bring the tips of his fingers together in front with his eyes
closed, which he · accomplished correctly. His pulse rate
was 72, his heart action quite good. There was no evi-
dence of disease in his lungs. He was asked about his
height and weight, and said he was 4· feet 10 inches tall

and weighed 120 pounds.  He in fact was 5 feet 8½ inches
tall and weighed 152 pounds.  He was asked what he in-
tended to do when he grew up, and he said he would be
a prize fighter, and made movements showing his muscles.
He was asked where he would learn to box, and said at
the Moody Bible Institute.  Without being questioned he
said he wanted to go to the hospital and have a new bandage
put on his arm.  The doctor asked why he wanted a new
one, and he said it was Sunday and he thought he ought
to have a clean bandage.  The doctor asked how his arm
had been hurt, and he said he had hurt it with an ice-pick,
fooling around the stock yards.  The doctor examined him
the second time about two weeks later.  The plaintiff in er-
ror gave the date of his birth as September 10, 1904.  In
answer to questions he said that he did not hurt his arm,—
that it just got sore; that he had been in jail for about
two weeks,—why, he didn't know, but he supposed for
running away from home; that he had run away from
home a week ago; that he went to Iowa but didn't remem-
ber the name of the town.  On being pressed he said that
the town was Springfield.  Being asked how he got there,
he said on the train; asked what road, he said railroad;
asked what railroad, he said in a box-car; asked where he
got on the train, he said at State and LaSalle streets; asked
what roads started from there, he said lots of them; asked
whether he remembered the doctor, he said that he did not;
asked to write his name, he spelled Walter without an a,
Krauser with an u that looked like an m; asked to write,
"Where there is a will there is a way," he mis-spelled all
of the words.

The third examination was with Dr. Krohn.  Asked his
age and birthday the plaintiff in error gave his age as nine-
teen and his birthday as some time in January.  He gave
the names of two schools which he had attended,—Tilden
and Graham schools.  Asked to write the names of the
schools, he wrote "ilden" and "Dram."  Asked to walk

along a plank in the floor and count his steps as he walked, he walked along the plank without stumbling or apparent difficulty and counted correctly to the end, 15, except that he started with 3 instead of 1. Asked if he knew either of the doctors or one of the assistant jailors who was passing through, he said he had seen none of them before. Asked if he ever had a gun, he said he had never carried a gun. In answer to further questions he said he had never had an occupation; that he picked up money on the streets; that he did not know Sonny Dunn.

Dr. Singer made notes of his various interviews with the plaintiff in error as they progressed, and these notes, having been transcribed, were placed in evidence without objection, in connection with his testimony.

Dr. Krohn also testified as to the interview which he and Dr. Singer had with the plaintiff in error in February, and as to two other interviews,—one on January 6 and the other on January 11,—which he had with the plaintiff in error alone. The first interview lasted about two hours and the second about an hour and fifteen minutes. The first examination started with certain neurological tests to find out whether the brain or nervous system, or both, had suffered from any disease or injury that would in any way disturb the honesty of the action of the brain or of the nerves. The response given to each test for reflexes was within normal range. He stood with his eyes closed and feet together without swaying, showing that the cord was not affected. He walked the full length of the room without swaying, showing the proper co-ordination of his muscles. He counted the eighteen steps which he took, in order. His heart action was normal before and after walking. The doctor then asked questions of the plaintiff in error. Asked to write his name, he wrote "Wlter." Krauser he spelled "Kra" then half of "u," then "ser." Then he wrote it "Krauser," then "Kruser," and said both were correct. He said his father was a night watchman and had

been for one hundred years. He said he fell and hurt his arm. Asked if the skin were broken, he said the doctor made it bleed. He said he was born August 10. On the next examination he said his arm bled more than a bucket full; that he was born in September; that he went to Graham school, which he spelled "Dram." Tilden he spelled· "Tildun." He said that he had been in jail two or three days; that he had worked as an errand boy, had driven a horse in the stock yards, had been a chauffeur; that he had not been on the island or in solitary confinement in jail.

Dr. Krohn also testified about the examination of the plaintiff in error which was made by both doctors, and said that about ten days later he went to the jail to examine Pastoni. While he was in the corridor the plaintiff in error, who had been to see a visitor, came along, whistling. Dr. Krohn asked what he was whistling, and he said, "My Wild Irish Rose." The doctor said, "You have a German name; how do you happen to be whistling that?" He answered, "My mother might be Irish." He said that his sister, Bertha, had been to see him. The doctor asked when his trial would come up, and he answered in two or three weeks. Asked if he knew what judge, he answered "no." The doctor asked, "Can't you think what judge you are going to have your trial before?" and he answered that he didn't know. The doctor asked, "Is it going to be Kavanagh?" He answered, "Not that guy; look at what he handed Smith."

On April 26 the plaintiff in error was brought into court for a hearing on his original plea of guilty and was there examined. Drs. Singer and Krohn were present and testified in the trial of this case, which started on May 4, as to what the plaintiff in error said on the hearing in April. The plaintiff in error was in tears as he stood before the court in April and was examined. Dr. Krohn testified that the substance of the examination was as follows: "He was asked his name, to which he replied Walter Krauser;

asked where he lived, 614 West Forty-third place; was asked his age, and he said nineteen. This is on direct examination by Judge McEwen. He was asked his birthday, and he said August 10; asked where he went to school, he said Fallon school; asked how long he knew Bernard Grant, said about two or three months, finally two months; asked if he ever owned or had a gun, he said no; asked when he first saw Bernard Grant at about time of this incident, he said the afternoon or evening before, at a candy store while he had some ice cream; asked by his counsel where he got money with which to buy ice cream, he said from his mother; that while there Grant came in; that he didn't eat ice cream; later met Grant at a dance hall at Forty-third and Halsted; went into the hall in response to a request of Grant, who wasn't there; asked how long after Grant came in, he told it was five minutes after; asked if he saw anybody else there he knew besides Grant, he said he didn't; asked if he danced, he said he did not; that he just went to look; that he had followed the crowd at the corner and went up to the dance hall; asked whether he had ever talked with Milo Barrett about stick-ups, or with anyone else, he said he had not talked about stick-ups; asked what he and Grant talked about at dance hall, said Grant told him to get a gun; that he got a gun off Shea; that Shea didn't have it with him but had slipped it somewhere; waited in front of house and later on Shea brought the gun to him; he had gone to bed and got up at six o'clock. In response to a question said he had a light breakfast of coffee and buns; went to Forty-seventh and Halsted; Grant wasn't there when he first got there but came a little later; he and Grant boarded street car. In response to a question, said it was a Racine car; asked by counsel if he had any money, he said no; asked who paid fare, he said Grant did; asked how much he had, he said twenty-five cents; that Grant, in response to a question, said he had ridden on the car to a block beyond a tea store that was pointed out

while they were on car; that they walked back a block and walked a little farther back and then turned around; that before they went into that store Grant had showed him how to hold a gun and what he was to do when he went in,—to say 'Hands up!' that they did go into the store and said, 'Hands up;' that he ordered a man in the tea store to back of the room; that there was a man and boy in the store; that Grant had told him to throw a bolt in the door; that they then locked the man and boy in the toilet; that they came out and got on another car and went to about Fifty-fifth; that at or near a school house they divided the money,—about $15; that Grant said to him in response to a question, 'That that ain't no money; we ought to have $100;' that he handed the gun to Grant to hold for him while he went into a toilet; that they went to Fifty-fourth street; that in the second tea store Grant told him to do the same as before. In response to a question he stated he ordered this man to a back room with his hands up; that while there another person came out and ordered him to put his hands up; that this man kept coming towards him; that he yelled to Bernie, and at the same time the man had grabbed his wrist. He stated in response to a question that a shot was fired. A little later, in reply to a question, he said the only time the gun was in his hand was when the first shot was fired; that he fell; that Grant, on being called to him, had struck the man who had grabbed his hand, in the back of the neck four or five times; that they ran from the store; that he threw his overcoat away; that he lost his cap in the store; that they went to the neighborhood of Forty-eighth and Union; that he got a hat at the house of a woman who either said she had lived down-stairs in the same house or he had lived down-stairs in the same house with them some years before; that Grant was in the basement; that after he got the hat they divided the money; that they then separated; that he went on a street car to Cottage Grove avenue; that he went on a Cottage Grove

avenue car down-town; that he went to a nickel show; that he went to a hotel, which he did not locate in response to a question and didn't give cross-street it was near; that while in a room in the hotel he met a cripple, in which something was said about going to make $1000, to which request of the cripple he answered no; that he was arrested in the night, but in reply to a question he didn't state the time of arrest; that he was taken to the stock yards station. He was asked at the close of these questions, and some others I don't recall, about some automobile affairs he had been in, and in the midst of that question was asked by his counsel to repeat all he had said before in the form of a story without being asked questions,—just as if he were telling his sister the whole story about what happened. He didn't tell the whole story. He was then asked about automobile affairs he had been in before, and in that connection who had taken the automobile, and said that Edward Ratigan had taken or stolen it and he had a ride in it with him; that on one of the three, and at one time think he said four, occasions when he was riding in a stolen automobile it came in contact with a street car and he received an injury which caused a scar on his head; that Edward Ratigan was not in the same court that he was; that he (Krauser) was in the larger court. He was asked what an accelerator was and what a carburetor was and what he did in working at a garage, and said he just pumped gasoline and things like that. On cross-examination he was asked if he was left-handed, and he said no, he was right-handed; asked who the man was who had been asking questions, who his lawyer was, he said McEwen; asked if he knew the name of the person questioning him, he said no; asked if he knew whether the person questioning was a doctor, a lawyer or a man, he said he did not know; asked if this was a trial, he said no, it is a case; that he knew this was a court room; asked if he knew who is interested in the trial, he said everybody. He said he knew

what an A. & P. store was. Then a series of questions followed, the answers to all of which was no."

The two doctors, Singer and Krohn, formed the opinion that the plaintiff in error was feigning insanity, and they thought that he was neithei insane nor feeble-minded. In his statements before the police and before the coroner he had told his story, insisting that Souders had got control of the gun in the struggle and had shot himself; that he, the plaintiff in error, did not have his hand on it after the first shot. His story as told on the several occasions bore evidence that he knew what his acts had been and was seeking to mitigate the seriousness of the consequences to himself by stressing the point that the policeman had killed himself. The intelligent statements made to the police and coroner when compared with the puerile and imbecile statements to the doctors in the jail and answers to their questions tend to support the conclusion that the plaintiff in error had changed his defense and was seeking to escape the penalty for his crime by shamming feeble-mindedness. At any rate, the doctors thought that he was shamming, and the jury, from the evidence which was before them, could hardly have reached a different conclusion.

The plaintiff in error contends that the shot which killed Souders was fired by Souders himself; that for that reason the plaintiff in error cannot be held responsible for murder, and that instructions asked on the subject of manslaughter should have been given. The statements of the plaintiff in error were not admitted as evidence of the crime but merely on the question of his mental condition, but if it be admitted that Souders shot himself in the struggle for the gun, such a result might reasonably have been anticipated when he started to rob at the point of a revolver. There was no evidence which required the giving of instructions on the subject of manslaughter.

In *Butler* v. *People,* 125 Ill. 641, a riot was in progress in which the plaintiffs in error were taking part. The mar-

shal of the village attempted to arrest one of the plaintiffs in error, but he was resisted and the by-standers undertook to stop the fight. While they were parting the men the marshal discharged his revolver and one of the by-standers was killed. An indictment for murder was returned against the rioters and two of them were convicted of manslaughter. The conviction was reversed, and it was held that there existed no common purpose or design between the defendants and the marshal and the former were not responsible for the acts of the latter. It was said, however, that they would be responsible for what they did themselves and such consequences as might naturally flow from their acts and conduct. The shooting of Souders was a consequence naturally to be expected from the plaintiff in error's acts. He made an assault with a deadly weapon, and Souders was justified in resisting the attack and would have been justified in killing the plaintiff in error to prevent the crime. He seized the plaintiff in error, and in the struggle the revolver was discharged. It is not material whether it was in the hand of the plaintiff in error or Souders. The plaintiff in error had the intent to commit murder if resisted. He was resisted, and the struggle resulted in the discharge of the revolver and the death of Souders. It was the act of the plaintiff in error whether his hand or Souders' held the revolver, and the crime was murder and not manslaughter.

The testimony of the two physicians, Singer and Krohn, of the physical and mental examinations which they made of the plaintiff in error was objected to as compelling him to give evidence against himself, and it is urged that the admission of the testimony over the objection was error. The rule is stated in 16 Corpus Juris, on page 568, as follows: "Where the defense interposed is insanity, evidence of the facts disclosed at a physical and mental examination of accused by physicians, either prior to the trial or during an adjournment of the court while the trial is in progress, does not vitiate the constitutional privilege of accused not

to be a witness against himself." The following cases are cited to support the text: *State* v. *Petty,* 32 Nev. 384, Ann. Cas. 1912D, 223; *People* v. *Austin,* 199 N. Y. 446, 93 N. E. 57; *People* v. *Furlong,* 187 N. Y. 198, 79 N. E. 978; *People* v. *Truck,* 170 N. Y. 203, 63 N. E. 281; *State* v. *Spangler,* 92 Wash. 636, 159 Pac. 810.

One of the doctors in the examination at the jail in which both doctors took part, asked the plaintiff in error if he knew Sonny Dunn. The answer was in the negative. The plaintiff in error says that Sonny Dunn was a notorious character in the world of crime and that the bringing of his name into the record was prejudicial. There is nothing in the record to show that Sonny Dunn was a criminal, however, nor was there anything in the question to so indicate. The court cannot take judicial notice of the character of the man whose name was mentioned, and we cannot say that plaintiff in error was prejudiced.

One of the statements which the plaintiff in error made as to his part in the crime and his actions before and after its commission was given in the police station in the early morning of December 20, 1922. The People sought to show in rebuttal, on the question of sanity, only, the examination of the plaintiff in error which was then made by questioning him, and for that purpose produced as a witness James J. Sullivan, who was secretary to police lieutenant Larkin, of the Halsted street station, and was present and recorded the conversation in shorthand. The plaintiff in error made the general objection that the statement was properly a part of the case of the People in chief and was not competent in rebuttal. The witness testified that his original notes correctly showed what took place. The plaintiff in error objected that the reading of the notes was not the proper method of proving what was said. The witness then testified as to what he remembered. The People then asked the witness to read from his book of original notes. The plaintiff in error objected to this method of

proving what was said. The objection was overruled and the witness read the statement to the jury from his notes. The stenographer who reported the proceedings at the inquest was offered as a witness to show the examination of the plaintiff in error at the inquest. He testified that his notes correctly showed what took place and that he had practically no recollection of anything which the plaintiff in error said. The plaintiff in error made the same objections as were made to Sullivan's testimony and they were overruled. It is contended that it was error to permit the stenographers to read their notes.

The rule in this State is that a witness can testify only to such facts as are within his knowledge and recollection, but he is permitted to refresh and assist his memory by the use of a written instrument, memorandum or entry in a book, and it is not necessary that the writing should have been made by the witness himself or that it should have been an original writing, provided that after inspecting the record he can speak to the facts from his own recollection. (*Scovill Manf. Co.* v. *Cassidy,* 275 Ill. 462; *Walsh* v. *Chicago Railways Co.* 303 id. 339; *Diamond Glue Co.* v. *Wietzychowski,* 227 id. 338.) Undoubtedly the witnesses here might have been permitted to refresh their memories from the notes which they had made, but the course followed was the reading of their notes as original evidence, each having testified that his notes correctly recorded what had been said. The shorthand notes were made in each case in the regular course of duty of the reporter. The evidence offered was admissible solely for its bearing upon the question of the mental condition of the plaintiff in error. It was important that the language used in asking and answering the questions be accurately placed before the jury and the expert witnesses who were to be asked to base an opinion thereon. The normal memory of witnesses is not sufficiently accurate to recall the exact words used in an extended conversation. A memorandum

made by a witness at the time of the transaction, in the usual course of business, may be referred to by the witness to refresh his memory. Whether it may be received in evidence in connection with the testimony of the witness who made it, and who testifies that the facts were correctly stated in it at the time, is a question upon which the authorities are conflicting. In *Curtis* v. *Bradley,* 65 Conn. 99, *State* v. *Brady,* 100 Iowa, 191, and *Republic Fire Ins. Co.* v. *Weides,* 14 Wall. 375, the evidence was received, and in the particular case of proving the language of a conversation or the testimony of a witness the stenographic notes are no less worthy of credit than the testimony of the stenographer. It would be an extraordinary memory which would enable a witness to repeat even the substance of an examination of any considerable length, much less the particular words used. There was no error in permitting the stenographers to read their notes to the jury.

The People produced as non-expert witnesses to give their opinions of the sanity of the plaintiff in error certain policemen and two assistant State's attorneys, each of whom had heard one or more of the statements which the plaintiff in error had made. One of these witnesses was Michael Hughes, chief of detectives. He had been present at the examination of the plaintiff in error at the police station which occurred on the morning of December 20, 1922. The plaintiff in error had been at that time under the observation of the witness from two o'clock until six or seven o'clock. What had then occurred had been testified to by other witnesses, including the stenographer, and there was no question of the accuracy of the evidence showing the occurrences. The jury therefore had before them the story of what had then happened in the presence of the witness Hughes. The State's attorney, not requiring the witness to state the facts upon which he had formed an opinion of the sanity of the plaintiff in error, said, "With the court's permission I will omit the details." Counsel for

the plaintiff in error said, "I will make the same objection."
The objection was that a proper basis had not been laid to
permit the witness to express his opinion, that the witness
was not a proper witness to testify as to his opinion, and
that evidence of the occurrences at the police station was not
proper in rebuttal. The court overruled the objection, and
the plaintiff in error argues that it was error not to require
the witness to state the things which he observed and upon
which he based his opinion. The witness was not an ex-
pert upon nervous and mental disorders. "The rule is, that
non-experts who have had opportunities to observe a person
may give their opinion of his mental condition or capacity,
at the same time stating their reasons and the facts observed
on which they base their opinions, including conversations
as a part of the observed facts, but to render such opinions
admissible they must be limited to conclusions drawn from
the specific facts thus disclosed." (*Jamison* v. *People,* 145
Ill. 357.) It was erroneous to permit the witness Hughes
to give his opinion to the jury without requiring him to
state what facts he based his opinion on, so that the jury
might judge of its reasonableness. While Hughes was
present at the examination, the evidence does not show
that his opinion was formed upon a consideration of all
that occurred in his presence. He may not have observed
all that occurred, may have given little consideration to
most of it, and may have formed his opinion upon a con-
sideration of only a very small part of what occurred in his
presence, and that not the most important part. Because of
his prominence the jury may possibly have accorded more
weight to his opinion than it would have been entitled to
had the facts upon which it was based been stated, though
had this been the only error it would not, perhaps, have
required a reversal of the judgment.

The testimony of the various statements made by the
plaintiff in error before his trial, except in one instance, was
limited by the rulings of the court to the sole question of

his mental condition. They were all introduced in rebuttal. The excepted instance was of his statements and conduct before the circuit court on the hearing before his plea of guilty had been withdrawn. The doctors Singer and Krohn were permitted to state what then occurred, they having been present, as a part of the basis upon which their opinions were formed. Dr. Singer first testified of this matter. Counsel for the plaintiff in error objected, "I wish to renew my objection that I have made heretofore." When Dr. Krohn was offered to testify as to the matter the objection was, "I make the same objection that I did to Dr. Singer's testimony." The objection to Dr. Singer's testimony was as to what occurred in the first interview in the jail. It was as follows: "I want to make an objection to the detailing of this testimony of the doctor testifying to anything that occurred there between himself and Walter Krauser, for the reason that such an examination was made at the request of the State's attorney, without the consent of Krauser or his being consulted, while he was in jail and while he had no one representing him present, and the doctor no doubt will relate, if he is permitted to proceed, an interview with him concerning the facts in this case, and that I think, as a matter of a man's personal rights, that they were violated in this instance, and the doctor should not be permitted to testify on that." The objection was properly overruled, for the evidence was proper to be presented to the jury as showing a part of the facts upon which the doctors based their opinions as to the mental condition of the plaintiff in error. Subsequently, when like evidence was offered, the trial judge specifically ruled that it was admissible for the one purpose, only. The purpose of its presentation by the doctors was apparent. The jury could not have misunderstood, for the People needed no statement by the plaintiff in error to make its case in chief. The only substantial matter in dispute was whether the plaintiff in error was mentally responsible for his acts.

The plaintiff in error contends that it was error to permit the doctors Singer and Krohn to testify that plaintiff in error was falsifying and feigning insanity. This followed necessarily from their opinion that he was neither insane nor feeble-minded, which they presented to the jury.

The witness Michael J. Grady testified that immediately before the plaintiff in error made his statement in the police station on the morning of December 20 he was told that if he should make a statement it would be used for or against him in court. It is urged for the plaintiff in error that the statement that was then made was thereby rendered involuntary, for a self-serving statement could in no event have been used for him on his trial. The objection could be available only if the statement were offered as evidence of the crime, but as it is in evidence only upon the defense of insanity, the objection that it was made under the influence of hope of gain or fear of punishment was properly overruled. So far as the purpose for which the statement was admitted is concerned, it made no difference whether the statement was voluntary or not.

The plaintiff in error contends that the giving of instruction No. 14 for the People was erroneous. The instruction was as follows:

"The court instructs the jury that a safe and reasonable test in all cases of insanity is that whenever it appears from the evidence that at the time of doing the act charged the defendant was not of sound mind but affected with insanity and that such affection was the efficient cause of the act, and that he would not have done the act but for that affection, he ought to be acquitted. But this unsoundness of mind, or affection of insanity, must be of such a degree as to create an uncontrollable impulse to do the act charged by overriding the reason and judgment and obliterating the sense of right or wrong as to the particular act done and depriving the accused of the power of choosing between right and wrong."

The law as given in the instruction was stated in *Hopps* v. *People,* 31 Ill. 385. The objections to it are as follows: "This instruction is bad because (1) it does not fit the modern scientific view of insanity,—an impulse is not necessary; (2) it omits the element of ability to act, for an insane person may know the difference between right and wrong, and he may be able to choose right from wrong knowingly but be incapable of acting according to his judgment and choice; and (3) it requires both understanding and will, whereas either is a defense; and (4) it assumes he fired the shot charged in the indictment."

In *People* v. *Lowhone,* 292 Ill. 32, it was said that since the *Hopps* case advances have been made in knowledge on the subject of insanity, its various types and characteristics, and that it is now recognized that there are cases of partial insanity which may render a person incapable of knowing a particular act to be wrong, or if he can distinguish right from wrong as to a particular act he may be incapable of exercising the power to choose between the right and the wrong. It was said that the mere ability to distinguish right from wrong was not the correct test, and the first two instructions were held to be bad because "they omit the necessary element, in cases of this character, that the accused must also be mentally capable of choosing either to do or not to do the act and of governing his conduct in accordance with such choice." The first sentence of instruction 14 states that if the defendant's affection with insanity was the efficient cause of his act and he would not have done it but for that affection he should be acquitted. The next sentence undertakes to state the character of the affection of insanity, and says that it must be such as to override the reason and judgment, obliterate the sense of right or wrong, and deprive the accused of the power of choosing between right and wrong. This instruction, to justify an acquittal, requires of the defendant not only the ability to distinguish between right and wrong but the power

315—33

to choose between them and act according to his choice; he must not only understand the character of his act but have the power to choose and to act accordingly. In the *Low-hone case* the ability to judge and the power to choose are held equally necessary to criminal responsibility, and therefore the lack of either will justify a verdict of not guilty. The instruction in question states that both the knowledge of right and wrong and the ability to choose between them are necessary to such a verdict, and it was therefore erroneous to give it.

Instructions 6, 10 and 11, not including the last sentence of each, were as follows:

6. "The jury are further instructed that if they believe from the evidence in this case beyond a reasonable doubt that Walter Krauser or any accomplice the evidence might show, inflicted upon the deceased, Ralph Souders, a mortal wound which caused the death of the said Ralph Souders as charged in the indictment, and that such killing was involuntary on the part of the person so inflicting the wound as aforesaid, yet if you further believe that the wound which caused the death of the said Ralph Souders was inflicted upon him by said person or persons while in the commission of an unlawful act which in its consequences naturally tended to destroy human life, then, under such circumstances, the defendant is guilty of murder, and the jury should so find.

10. "The court further instructs you that if you are satisfied by the evidence in this case beyond a reasonable doubt that the defendant, Walter Krauser, entered into a conspiracy to commit robbery, and that in pursuance of said conspiracy, the said defendant, Walter Krauser, was armed with a revolver to consummate said conspiracy, and that some act or acts were performed by said defendant, Walter Krauser, toward the consummation of said conspiracy, and that in pursuance of the common design, the defendant, Walter Krauser, or any accomplice the evidence may show

that he had, while in the act of prosecuting the robbery, killed the deceased in this case, in manner and form as charged in the indictment, then all persons engaged in such conspiracy are guilty of murder, regardless of whether the other persons not firing the shot had the specific intent to kill the deceased.

11. "The court instructs you that any killing which shall happen in the prosecution of a felonious intent shall be deemed and adjudged to be murder.  So that, if you believe from the evidence in this case beyond a reasonable doubt that Walter Krauser or any accomplice shown by the evidence shot and killed Ralph Souders, in manner and form as charged in the indictment and while engaged in the prosecution of a felony, the offense shall be deemed and adjudged to be murder; and the law does not permit any defendant in such a case to avail himself of the defense of self-defense; nor would such a killing be excusable as a misadventure, for the statute excusing one who unfortunately kills another by misadventure provides that the person killing be engaged in a lawful act.  Robbery in this State is a felony."

Each of these instructions entirely ignored the defense of insanity and concluded with these words:  "The court by this or any other instruction does not intend to express any opinion upon the facts of this case, nor does he intend to cover the law concerning insanity.  As to the law covering insanity, you are referred to other instructions given by the court."

In instruction 21 it was stated "that these instructions are given and should be considered together as one entire series, and each instruction should be considered in connection with all other instructions bearing upon the same subject."  There is an obvious contradiction seen in the conclusion of instructions 6, 10 and 11 in first stating that the court did not intend by any instruction to cover the law concerning insanity and then referring the jury as to that

law to other instructions given by the court. But perhaps the jury would not be misled by the contradiction. The plaintiff in error, however, makes a more serious objection. These instructions directed a verdict without regard to the defense of insanity and apparently had no relation to that defense. Instruction 21 directed the jury to consider each instruction in connection with all other instructions bearing upon the same subject. In following that instruction the jury would naturally consider the instructions which were given upon the subject of insanity in connection with other instructions upon that subject but not in connection with instructions 6, 10 and 11, which directed a verdict, and as to these instructions the defense of insanity thus being made was taken out of the case. It was error to give these instructions.

Instruction 2 refers to implied malice but ignores the question of insanity, and the instructions do not anywhere require the question of insanity to be considered in connection with the question of implied malice. For this reason the instruction should not have been given.

Instruction No. 16 given at the request of the People was as follows: .

"The court instructs the jury that in order to find the defendant not guilty on the ground of insanity, such insanity must be so clearly proven as to raise a reasonable and well-founded doubt of the defendant's guilt when the whole evidence is taken together, and not a mere shadow or possibility of a doubt."

This imposed the burden of proving insanity upon the plaintiff in error and was erroneous for that reason. The burden of proving the sanity of the accused in a criminal case, where his sanity is in issue, is always on the prosecution, and it is not necessary, before the jury can find the defendant not guilty, that insanity should be proved clearly or even by a preponderance of the evidence. It is only necessary that there should be evidence tending to prove

insanity sufficient, in connection with all the evidence, to raise a reasonable doubt of the defendant's guilt. (*People* v. *Penman,* 271 Ill. 82; *Dacey* v. *People,* 116 id. 555.) The use of the words "clearly proven," in the instruction, was erroneous. So was the use of the word "well-founded" in connection with reasonable doubt. Many attempts have been made to define reasonable doubt, but it may well be doubted whether they have not confused rather than been of any material assistance to the jurors whom they were supposed to enlighten. It certainly is of no benefit to the juror or help to his arriving at a verdict to add to the requirement of a reasonable doubt the requisite that it shall also be well founded. The law gives the defendant the right to an acquittal if there is a reasonable doubt of his guilt. If a reasonable doubt actually exists, it is sufficient whether well or ill-founded. Jurors have always been told that a reasonable doubt of guilt was sufficient to entitle the defendant to a verdict of not guilty. Now to say to them that the doubt must be well-founded is merely to introduce confusion. *People* v. *Davis,* 300 Ill. 226.

Instruction No. 4 advised the jury in regard to judging of the credibility of witnesses, and after saying that the jurors should consider all the circumstances under which any witness testified, his demeanor and manner while on the stand, his interest, if any, in the outcome of the case, the relations which he bears to the State or defendant, the manner in which he might be affected by the verdict, the extent to which he is contradicted or corroborated by any other credible evidence, continued: "and any circumstances that tend to shed light upon his credibility. You should determine the amount of credence to which each statement is entitled at your hands as reasonable and intelligent men." The instruction, after enumerating circumstances to be considered, ended by directing the jury that they should take into consideration any circumstances and determine the credibility as reasonable and intelligent men. This left the

jurors merely to act on their own discretion. It told them that without any reference to the evidence in the case or what occurred during the trial they were at liberty to determine the credibility of the witnesses according to their own judgment, without any guidance from the court as to the reasons which might be proper to consider in determining the credibility of witnesses.

The defendant asked an instruction, No. 6, which was refused. It stated the rule requiring the jury to be satisfied of the guilt of the defendant beyond a reasonable doubt requires that the entire verdict which may be rendered upon the evidence shall be justified in the minds of the jury beyond a reasonable doubt,—that is, not only the question of guilt must be so determined, but the evidence from which the penalty is fixed should likewise establish in the minds of the jury a conviction, beyond a reasonable doubt, that the evidence justifies and requires the penalty fixed in the verdict which may be found by the jury; "and unless the jury can upon their oaths say that the punishment fixed by the verdict has been established beyond a reasonable doubt, and that they have a conscientious belief that such penalty is just and required by the law, then such verdict is unauthorized, and a lesser penalty should be fixed which meets with the requirement of representing the judgment of the jury beyond a reasonable doubt from the evidence." The doctrine of reasonable doubt has no application in the determination of the jury as to the penalty to be imposed. When the guilt of the defendant has been established beyond a reasonable doubt, the question of the penalty is committed by the law to the discretion of the jury, subject to the revision of the court on motion for a new trial. The punishment cannot be "established beyond a reasonable doubt." It is a question of judgment, to be exercised upon a consideration of the facts proved, and the instruction requested, instead of giving any information to the jury as to their duties, would have no other effect than to introduce

confusion into their deliberations. The imposition of the
death penalty in a verdict of guilty of murder, or of im-
prisonment for life or for fourteen years, or any other
term, can never be said to be established beyond a reason-
able doubt, but is a question to be determined by the jury
from a consideration of all the facts proved in the case.

The State's attorney, in his argument to the jury, pro-
posed to read from page 18 of the case of *State* v. *Ehlers,*
119 Atl. 15, and counsel for the defendant objected on the
ground that it was not a proposition of law but a statement
of purported fact or opinion which he was proposing to
read. The court overruled the objection and counsel read
the portion of the opinion which he desired, as follows,
quoting the testimony of an expert on the subject of epi-
lepsy: "He [the expert] also explained as to the mental
age of twelve years, that that was the average mental age
of the men of the American army in the World War, there-
by clearly demonstrating, as he frankly admitted, (he said,
'It was not worth shucks as applied to adults,') what has
been the observation of practically all our judges, (*State*
v. *Schilling,* 95 N. J. L. 145, 112 Atl. 400,) that the so-
called mental age theory of the experts, at least as applied
to adults, is based upon so arbitrary and unnatural a scale
of ages as a standard as to be utterly misleading to a lay-
man, and practically useless, if not worse than useless, in
the administration of justice by trial by jury."

Dr. Hickson testified in regard to the mental age theory
of the experts, about which the witness in the case from
which the State's attorney read to the jury testified, that it
was a system, proved by the different cases which he had
examined, used in the Rush Medical College, the Psyco-
pathic Hospital, the juvenile courts in various cities and
many insane hospitals and many preparatory schools. It
was the system as to which the testimony of the expert
that "it was not worth shucks as applied to adults" was
introduced to the jury during the argument after the evi-

dence was closed, without opportunity of cross-examination, and the testimony itself was pure hearsay in this case. Such a use of reported cases is not proper under the pretense of arguing the law to the jury. In the case of *People* v. *Rees,* 268 Ill. 585, the State's attorney read from reported cases a statement of the facts which the court said there was no reason for reading to enable the jury to understand any rule of law, and the only purpose or effect of the recital of the evidence was to show the similarity of the case read from to the case on trial and to lead the jury to a conclusion of fact as to the guilt of the defendant. The court said that the general rule is that counsel may read extracts from the opinions in reported cases bearing upon the law in the case but not the facts in the opinions. The plaintiff in error had a right to have his case submitted to the jury on the evidence introduced in the case, uninfluenced by the statement of a witness on the trial of another case in another court in another State, and the weight of the opinion of that court on the question of fact that the theory of the expert witnesses who testified in his behalf was utterly misleading to a layman, and practically useless, if not worse than useless, in the administration of justice in a trial by jury. The introduction at this time of such evidence was erroneous and was prejudicial to the plaintiff in error.

Other statements made by the State's attorney in the argument were objected to, but they ought not to occur on another trial and it will not be necessary to consider them.

The evidence as to the mental capacity of the plaintiff in error was such that he was entitled to have the jury accurately instructed.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*

Farmer and Thompson, JJ., dissenting.